UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID LONICH, *et al.*,<br><br>Defendants. | Case No. 14-cr-00139-SI-1<br><br>**ORDER DENYING DEFENDANT LONICH'S MOTION TO SUPPRESS EVIDENCE AND FOR AN EVIDENTIARY HEARING**<br><br>Re: Dkt. No. 186 |

Defendant David Lonich has moved to suppress evidence obtained as a result of the execution of a search warrant on April 9, 2014. Dkt. No. 186. Lonich also seeks an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), regarding the validity of that same warrant. *Id*. The Court held a hearing on April 12, 2016. Having carefully considered the parties' arguments, the Court hereby DENIES the motion to suppress and for a *Franks* hearing.

**BACKGROUND**

The facts of this case are detailed at length in the Court's January 27, 2016 Order re: Motions to Dismiss. Dkt. No. 162. For brevity, the Court recites here only those facts relevant to the motion at hand.

On March 18, 2014, the government filed a twenty-nine count indictment against defendants David Lonich, Brian Melland, and Sean Cutting.[1] Lonich is charged with conspiracy

---

[1] Bijan Madjlessi was originally charged in the indictment with the other defendants. Madjlessi died after the indictment and by operation of law all charges against him were dismissed.

to commit wire and bank fraud in violation of 18 U.S.C. § 1349 (Count One), bank fraud in violation of 18 U.S.C. § 1344 (Count Two), wire fraud in violation of 18 U.S.C. § 1343 (Counts Three through Eight), conspiracy to make false statements to a bank in violation of 18 U.S.C. § 371 (Count Nine), conspiracy to commit money laundering in violation of 18 U.S.C. §1956(h) (Count Ten), money laundering in violation of 18 U.S.C. § 1957 (Counts Eleven through Twenty-Two), making false bank entries in violation of 18 U.S.C. § 1005 (Counts Twenty-Four through Twenty-Eight), and attempted obstruction of justice in violation of 18 U.S.C. § 1512 (Count Twenty-Nine). Madjlessi was a real estate developer, Lonich was Madjlessi's attorney, Cutting was President and CEO of Sonoma Valley Bank until it failed in or about August 2010, and Melland was the Senior Vice President and Chief Loan Officer of Sonoma Valley Bank until March 2010.

The indictment alleges: "No later than approximately March 2009 until approximately September 2012, the defendants devised and executed a material scheme to defraud Sonoma Valley Bank and others and to obtain money from Sonoma Valley Bank and others by means of materially false and fraudulent pretenses, representations, and promises and by omissions and concealment of material facts." Indictment ¶ 7.

In April 2014, Special Agent Terry M. Neeley of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") submitted a search warrant application to Chief Magistrate Judge Joseph C. Spero. Dkt. No. 190-5 (Neeley Decl. ¶ 2). Neeley's twenty-nine page affidavit, which was provided in support of and incorporated into the search warrant application, described the nature of the investigation and the bases for probable cause. *See* Dkt. No. 190-1 (Warrant Affidavit). The affidavit provided:

> I am currently investigating real estate developers identified as Bijan MADJLESSI and David LONICH, and several of their associates, including COOPERATING SOURCE ("CS"), a construction contractor, Brian MELLAND, a banker, Sean CUTTING, a banker, and others. The targets of my investigation are suspected of fraudulently obtaining millions of dollars of loans from the now-defunct Sonoma Valley Bank ("SVB"), previously located in Sonoma, California. . . . The targets are further suspected of using SVB loan proceeds to fraudulently purchase from the FDIC a note relating to a portion of the Park Lane Villas ("PLV"), a multi-purpose residential and commercial development located in Santa Rosa, California. The scheme included seeking to obtain permanent financing from the Federal Home

Loan Mortgage Corporation ("Freddie Mac") or the Federal National Mortgage Association ("Fannie Mae").

I submit this affidavit in support of an application for a warrant to search for certain items particularly described in Attachment B, attached hereto and incorporated by reference, which may be present at the offices and residences of MADJLESSI and LONICH, more fully described in Attachment A . . . . There is probable cause to believe that documents related to MADJLESSI's and LONICH's purchase, ownership, and control of PLV are presently located at the subject premises. In addition, as requested below in Section XIII, this affidavit also seeks authorization to search computers, cell phones, and other electronic or digital devices (collectively, "digital devices") located in the subject premises for items described in Attachment B, following the procedures set forth herein and further described in Attachment C, attached hereto and incorporated by reference.

*Id.*

Attachment B "ITEMS TO BE SEIZED" of the affidavit to the warrant application identified the following items for seizure:

A. Evidence of violations of Title 18, United States Code, Sections 371 and 1349 (Conspiracy and Conspiracy to Commit Bank Fraud), Section 1344 (Bank Fraud), Section 656 (Misapplication of Bank Funds), Section 1005 (False Entries), Section 1512(c) (Attempted Obstruction of Justice –Tampering with a witness), Section 1343 (Wire Fraud), Section 1956(h) (Money Laundering Conspiracy) and Section 1957 (Money Laundering Transactions using Specified Unlawful Activity Proceeds), involving any scheme relating to a purchase by 101 Houseco, LLC of an IndyMac loan defaulted on by Bijan MADJLESSI associated with the Park Lane Villas ("PLV"), using funds obtained from Sonoma Valley Bank, any and all efforts to construct, remodel, or purchase any aspect of PLV, including the use of any Sonoma Valley Bank funds or documents, and any and all efforts to obtain funding, financing, or refinancing for any PLV-related activity, including from Terra Capital Partners and Freddie Mac. Such evidence, in physical or electronic form, includes all documents, business records, photographs, audio or video recordings, communications, and any evidence of the ownership, custody, control of, and association with, any of the following:

   1. Sonoma Valley Bank, including information on any legal lending limits to Bijan MADJLESSI or any entity or person associated with him;

   2. Sonoma Valley Bank employees, including Sean Cutting, Brian Melland, Veronica Ordaz, John Barr, Cathleen Gorham, Alexis Thompson, Genevieve Lota, Suzanne Brangham, and Kelly Bruns;

   3. Business entities associated with Bijan MADJLESSI and David LONICH, including 132 Village Square, LLC, 114 Park Lane Santa Rosa, LLC, Masma Construction, Greenbriar Construction, and Menlo Oaks Corporation;

4. 101 Houseco, LLC and any related entities, including the House Family Investment Trust, the Houseco Investment Trust, the Sterling Residence Trust, 103 Star, LLC, Ananda Partners 1 LLC, Ananda Advisors, Annadel Capital, Inc., and 101 Park Lane, LLC;

5. Terra Capital Partners, and any of its employees or associates, including Adam Kies, Dan Cooperman, and David Packer;

6. The Debt Exchange ("DebtX") and any of its employees or associates, including Kenneth Daley and Kevin Kelley;

7. The Federal Deposit Insurance Corporation ("FDIC") and any of its employees or associates;

8. CBRE and any of its employees or associates;

9. The formation and control of any companies incorporated or to be incorporated in Panama; and

10. The following individuals:
    - Patricia Brajkovich
    - Martel Jed Cooper
    - Farhad Hariri
    - Derrek Horn
    - Phillip Horn
    - James House
    - Kristina House
    - Pamela Hubbard
    - Jennifer Irvine
    - Elizabeth Madjlessi
    - Michael Madjlessi
    - Cornelius Oosterbaan
    - Eric Reed
    - Michael Greg Smith
    - Terry Strongin
    - William Kelly Vandever
    - Michael Zalkaske
    - John Carrillo
    - Terry Neeley
    - Jim Thiede

B. Evidence of the custody, occupancy, ownership, or control of PLV and any money generated by or associated with it by any party, and any subpart of PLV such as residential or commercial units of PLV, including agreements or documents associated with the purchase, sale, lease-back of apartments, condominiums, or office space located within PLV or associated with PLV or any related loans, and any records relating to any funds generated by or associated with PLV and the disposition of any such funds.

C. Evidence of any association between and contact among Bijan MADJLESSI, David LONICH, Sean CUTTING, and Brian MELLAND including photographs depicting them or any subset of two or more of them, their presence in any one of their contact lists, whether electronic or otherwise, or communication between them of any variety.

D. Evidence of custody, occupancy, ownership, or control of any of the locations searched pursuant to this warrant, including documents relating to the rental or ownership of the locations, mail addresses to the locations, identification documents found therein, and any other relevant indicia.

*Id*.

Attachment C of the affidavit specified the search procedures for digital devices. *Id*. Specifically, it stated that in circumstances where the government cannot complete a search on site, it may duplicate the contents of the device and complete the forensic review of the mirror image within 120 days of the execution of the search warrant. *Id*. If the government cannot duplicate the device, "the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device." *Id*. In circumstances where the government removes the device from the site, "the government must file a return with a magistrate judge that identifies with particularity the removed device . . . within 14 calendar days of the execution of the search warrant." *Id.*

Pursuant to the process laid out in the affidavit to the search warrant application, the government formed a "taint team" to review the seized materials. *Id*. The affidavit stated, "[ou]t of an abundance of caution, and given the nature of the requested search which includes the offices and residence of an attorney, all materials seized at the time of the search shall be treated as potentially privileged material and a Privilege Team shall be employed." *Id*.

On April 7, 2014, Judge Spero approved the search warrant application. Dkt. No. 190-5 (Neeley Decl. ¶ 2). The warrant authorized the search of Lonich's residence, Madjlessi's residence, and the three business offices located at Park Lane Villas ("PLV"). *Id*. On April 9, 2014, the government executed the search warrant and seized materials from all three locations. *Id*.

Beginning in December 2014, and continuing over the course of the next approximately

5

1  ten months, the parties engaged in discussions regarding whether certain of the documents were
2  privileged. *See* Dkt. No. 123 (Balogh Decl. ¶¶ 28-30). The government has filed a separate
3  motion, not currently before the Court, regarding whether various documents seized during the
4  searches are privileged, and that motion has not yet been heard.

5  On March 4, 2016, Lonich filed the present motion seeking to suppress the evidence
6  gathered as a result of the April 7, 2014 search warrant and seeking an evidentiary hearing under
7  *Franks v. Delaware*, 438 U.S. 154 (1978). Dkt. No. 186. The government filed its opposition on
8  March 25, 2016, and Lonich filed his reply on April 1, 2016. Dkt. Nos. 190, 196.

## DISCUSSION

### I.  Standing

The parties dispute whether Lonich has standing to challenge the searches of Madjlessi's home or the rest of the office space at the Park Lane Villas. The government does not seriously dispute that Lonich has standing to challenge the searches of his own house and office. The Court finds that even assuming Lonich has standing to challenge the searches of Madjlessi's home or the rest of the office space at the Park Lane Villas, Lonich has not shown that the April 7, 2014 search warrant is invalid.

### II.  Search Warrant Requirements

For a warrant to be valid, it must satisfy two related but distinct requirements: the particularity rule and the probable cause rule. "No warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. "Particularity is the requirement that the warrant must clearly state what is sought." *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991). Whether a warrant is sufficiently particular is judged on the basis of those facts which the officers knew or should have known at the time the warrant was issued. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). A search warrant "must be no broader than the probable cause on which it is based." *United States v. Weber*, 923 F.2d 1338, 1342 (9th

Cir. 1990). The Ninth Circuit has instructed that, in order to determine whether the warrant's description complies with this mandate, a court should ascertain (1) whether there is probable cause to seize all of the items of the type described in the warrant; (2) whether it sets forth objective standards to guide the executing officers' identification of objects that are subject to seizure; and (3) whether the government could have described the items with greater particularity under the circumstances. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (citations omitted).

Review of a determination that a warrant was supported by probable cause is deferential; "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (alteration in original); *see also United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) ("Normally, we do not 'flyspeck' the affidavit supporting a search warrant through de novo review; rather, the magistrate judge's determination should be paid great deference." (internal quotation marks omitted)).

The main issue before the Court is whether the April 7 search warrant is overbroad because it authorized the seizure of evidence for which there was no probable cause. Lonich does not challenge the warrant's particularity requirement *per se*.[2] The Court will nevertheless address particularity because it relates to the Court's finding that the warrant at issue is valid.

**A.  Probable Cause and Overbreadth**

Lonich argues that the April 7 warrant is overbroad because it permitted the seizure of materials for which the government did not demonstrate probable cause. Lonich cites a string of Ninth Circuit cases, including *United States v. Stubbs*, 873 F.2d 210, 211 (9th Cir. 1989), to support his assertion that simply because the government may have had probable cause to search

---

[2] In his Reply, Lonich states that "[r]ather than demonstrate . . . that it presented 'probable cause . . . to seize all items of a particular type described in the warrant,'" the cases the government cites to support its position "mostly deal with particularity challenges, not overbreadth challenges, and have no bearing on Attorney Lonich's motion." Dkt. No. 196 at 7. Lonich characterizes such cases as "meaningless" because they address particularity challenges and not the overbreadth challenges, which Lonich brings in his motion.

7

materials pertaining to "certain aspects of [an] operation," the government is not justified in seizing any and all documents present on site. Dkt. No. 186 at 13. Lonich contends that the purportedly overbroad warrant allowed the government to seize any and all materials related to defendants and the individuals with whom the defendants interacted, irrespective of the alleged fraud. Lonich states:

> on April 9, from David Lonich's home, the Government seized a series of "miscellaneous" documents and unidentified mail, a binder of materials regarding Beacon Homeward Bound LLC, David's mobile telephone, and his wife's, Linda Lonich's, mobile telephone, tablet, and personal computer. On the same date, the Government searched Mr. Lonich's offices at 960 Doubles Drive, seized his computers and the majority of legal papers from his office, including materials from clients other than Madjlessi and his entities. Similarly, the discovery reflects that the Government seized numerous communications Mr. Lonich had with attorneys representing him in various matters, including communications with Tom Carlucci and Joint Defense communications with Steven Bauer, and communications with Chris Wing, whom Lonich hired to represent Madjlessi with respect to allegations that Madjlessi used straw buyers. In addition, the Government seized and searched thousands of pages of privileged materials, including materials for Mr. Lonich's clients having nothing to do with 101 Houseco or the allegations in this case, and materials reflecting Mr. Lonich's communications with his lawyers regarding non-related civil matters, and this very investigation.

Dkt. No. 187 (Balogh Decl. ¶ 10).

Responding to Lonich's claims, the government asserts that the warrant does not authorize the seizure of all documents associated with the listed people and entities. Instead, the government argues that, when read holistically, the warrant validly seeks seizure of "evidence of ownership, custody, control of, and association with" the listed individuals and entities as it relates to the overall scheme to defraud. Dkt. No. 190-1 at 42. "Attachment B specifies a number of names and entities that have been identified as having specific relevance to the investigation leading to this warrant." *Id.* at 30. The government asserts that by challenging the subsets of the "ITEMS TO BE SEIZED" category of Attachment B, Lonich overlooks the plain language of the warrant. The government points out that Attachment B to the warrant lists the names of entities and individuals as examples of and guides to the overall type of evidence being sought. Such guidelines, the government argues, provide additional direction to the law enforcement officers conducting the search in the face of the existence of potentially privileged materials.

Defendant's overbreadth arguments are not without force. In the Court's view, it was

inartful to use the word "all" in the sentence "Such evidence, in physical or electronic form, includes *all* documents, business records, photographs, audio or video recordings, communications, and any evidence of the ownership, custody, control of, and association with . . . ." Dkt. No. 190-1 (Warrant Affidavit) (emphasis added). However, the Court agrees with the government that "such evidence" relates back to the evidence of the various crimes charged in the indictment and recited in the previous sentence, that "all" modifies "documents," and that "and any evidence of the ownership, ownership, custody, control of, and association with, any of the following" is a an explanatory limitation on "such evidence." When all its parts are read together, the warrant is not overbroad. The warrant commanded the executing officer to seize "[e]vidence of violations [of specific sections of Title 18 of the United States Code referencing a description of the criminal activities[3]], involving any scheme relating to a purchase by 101 Houseco, LLC . . . ." *Id.* As described in the attachment to the warrant, the listed names of individuals and entities were examples of "[s]uch evidence" and were "identified as having specific relevance to the investigation leading to this warrant." *Id.*; *cf. United States v. Kow*, 58 F.3d 423, 430 (9th Cir. 1995) (warrant affidavit did not provide probable cause to justify generalized seizure of all business documents where affidavit acknowledged that defendant business was a legitimate business and "[a]lthough [the government's] affidavit established probable cause to seize some business records, it did not establish that [defendants' business] was 'permeated with fraud,' the type of showing required to justify the wholesale seizure of business records that occurred here."). Unlike the warrant in *Kow*, the warrant here did not authorize the wholesale seizure of all of defendant's business records, but rather authorized the seizure of all evidence related to the overall scheme to defraud.

*United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009), is also instructive. In *SDI*, the defendants were charged with a conspiracy to defraud a Medicare program and commit

---

[3] Providing a description of the criminal activities instead of simply referring to the statute is in line with *Spilotro*. 800 F.2d at 964. There, the court cautioned, "the government could have narrowed most of the descriptions in the warrants either by describing in greater detail the items one commonly expects to find on premises used for the criminal activities in question, or, at the very least, by describing the criminal activities themselves rather than simply referring to the statute believed to have been violated." *Id*.

extensive tax fraud. *Id.* at 691. The district court suppressed in full the evidence obtained from the search warrant on the ground that items 7, 9-13, and 24 of the search warrant were overbroad and lacked sufficient particularity because "'[t]he search warrant did not limit these general categories of business documents and financial records to the seizure of records relating to the criminal activity described in the affidavit,' and because they lacked 'any time restriction.'" *Id.* at 694. Similarly, the district court noted that items 2, 4, 8, and 19, of the search warrant were "border line in acceptability," but nevertheless violated the Fourth Amendment because "some additional description could and should have been provided regarding these categories." *Id.* at 694.

On review, the Ninth Circuit rejected the district court's conclusion as to items 2, 4, 8, and 19. *Id.* at 704. The warrant described these four categories as follows:

> 2. Documents relating to billing procedures, billing manuals, and billing materials.
>
> 4. Documents relating to billing records and records of payments received.
>
> 8. Documents relating to correspondence with Medicare intermediaries and private insurance companies.
>
> 19. Documents relating to mailing and shipping records between physicians and SDI.

*Id.* at 703. In rejecting the district court's conclusion as to these categories, the Ninth Circuit explained:

> According to the affidavit, SDI's entire business involved sleep studies, and billing for phony sleep studies lay at the core of its scheme. There was probable cause, therefore, to support Category 2, in that any and all documents related to billing practices would have information relevant to whether SDI trained its employees to commit fraud or otherwise engaged in fraudulent billing. The same applies to Category 8. While the magistrate judge faulted the government for failing to specify that it sought 'billing and payments for sleep studies,' such criticism relied on the nonincorporation of the affidavit into the warrant. Including the affidavit as part of the warrant moots this concern. The affidavit also alleged that SDI engaged in both tax fraud and Medicare fraud, providing probable cause to support the seizure of all documents within the purview of category 4. Finally, in light of the government's allegation that SDI was engaging in mail fraud and providing illegal kickback payments to referring physicians, we conclude that Category 19 adequately limited the search to documents related to the mailing and shipping records with physicians (i.e., as opposed to allowing the seizure of all mailing and shipping records).[] It did not have to be any more restrictive.

*Id.* at 704.

In addition, the Ninth Circuit rejected the district court's finding that categories 7 and 13 were overbroad. *Id.* The *SDI* search warrant described these categories as follows: "7. Documents relating to non-privileged correspondence with consultants" and "13. Documents relating to accounting records." *Id.* As to Category 7, the Ninth Circuit explained that "[c]onsultants are contract counter-parties outside of a firm who assist it with one or another part of its business. Since, again, SDI's entire business involved sleep studies, it could have been difficult to specify beforehand which consultants were complicit in the fraudulent sleep studies." *Id.* Concerning Category 13, the court stated that "the only accounting records companies typically keep are those of their business dealings; they do not keep accounting records of their employees' personal finances. Since SDI's entire business involved sleep studies, all of its accounting records could potentially reveal evidence of the alleged fraud." *Id.* at 705.

On the other hand, the Ninth Circuit affirmed the district court's finding that the following categories were overbroad:

    9. Documents relating to non-privileged internal memoranda and E-mail.

    10. Documents relating to bank accounts, brokerage accounts, trusts.

    11. Checking, savings, and money market account records, including check registers, cancelled checks, monthly statements, wire transfers, and cashier's checks.

    12. Documents relating to personnel and payroll records.

    24. Rolodexes, address books and calendars.

*Id.* at 705. The Ninth Circuit explained that these five categories made no attempt to limit the search. *Id.* at 704. In fact, as to Category 24, the court called its characterization "the laziest of gestures in the direction of specificity" because this category "practically begs the search team to find and seize the contact information of every person who ever dealt with SDI." *Id.* at 705. The court explained that "[i]t would have been far more sensible, as well as constitutional, to limit the search to information relating to consultants, physicians, and health insurance companies, or some other group likely to turn up conspirators in the alleged fraud." *Id.* at 705.

Unlike the overbroad categories in the *SDI* search warrant, the portions of the search

11

1    warrant that Lonich challenges are based on probable cause and limit the search and seizure of
2    documents as they relate to the fraudulent scheme under investigation. *Id*. at 703. Attachment B
3    specifically describes the violations of which Lonich is suspected and lists examples of evidence
4    "includ[ing] all documents, business records, photographs, audio or video recordings,
5    communications, and any evidence of ownership, custody, control of, and association with"
6    specific entities and individuals relevant to the fraud investigation. Dkt. No. 190-1 (Warrant
7    Affidavit). Moreover, the list of names provided in Attachment B is the exact opposite of what the
8    Ninth Circuit called "the laziest of gestures in the direction of specificity." *Id.* at 705. Instead of
9    commanding the executing officers to seize any and all materials on the authorized premises, the
10   government here provided the names of individuals who are "likely to turn up conspirators in the
11   alleged fraud." *Id.* at 705. Thus, the Neeley affidavit was not overbroad. It provided a substantial
12   basis for Magistrate Judge Spero to find probable cause as to the seizure of all materials with a
13   connection to the fraud.

### B. Particularity

In addition to determining whether probable cause exists to seize all of the items of the type described in the warrant, a reviewing court should (1) ascertain whether the government could have described the items to be seized with greater particularity under the circumstances and (2) determine whether the warrant sets forth objective standards to guide the executing officers' identification of objects that are subject to seizure. *Spilotro*, 800 F.2d at 963.

While Lonich does not challenge the warrant's particularity requirement, he argues that the warrant is unconstitutional because it did not limit the search and seizure to the PLV East portion of the project, the financing of which is at issue in this case. Lonich's argument will be addressed in this section because it relates to the particularity requirement, specifically whether the government was required to make the distinction between the two phases of the project at the time it issued the warrant.

The government contends that the warrant was sufficiently particular. The government asserts that the warrant is not required to be limited to the collection of evidence pertaining only to

the involvement of the entities and individuals known at the time the warrant was issued so long as the warrant was based on probable cause. The government further argues that there is no requirement that a warrant must specify exactly how those entities and people were, at the time, known to have been involved in the fraud. In response to Lonich's claim about the lack of a particular distinction between the PLV East and West portions of the project, the government asserts that simply because the overall fraud scheme involved procurement of title to the East section of PLV, does not mean that the PLV project as a whole was not affected by the fraud. The government points out that just because the PLV project was phased into two sections, that does not change the fact that defendant "Madjlessi serve[d] as the primary construction contractor for the entire project . . . ." Dkt. No. 190 (Neeley Decl. ¶ 9). Quoting *United States v. Banks*, the government argues that "there is no requirement that the warrant be tailored to obtain only that evidence already known to exist." 556 F.3d 967, 973 (9th Cir. 2009). Consequently, it argues, Magistrate Judge Spero was within his authority to approve the seizure of evidence relating to PLV as a whole.

The government's arguments have merit. *United States v. Meek*, 366 F.3d 705, 715 (9th Cir. 2004) is on point. The *Meek* court found the warrant to be "sufficiently particular because the attachment to the warrant mentioned the crime . . . and the preface to the warrant limited the scope of the search to evidence of criminal activity." *Id*. (citing *United States v. Hay*, 231 F.3d 630, 638 (9th Cir. 2000)). In *Meek*, the Ninth Circuit distinguished the warrant from one that authorizes "'the seizure of virtually every document and computer file' without indicating how items were related to the suspected crime.'" *Id*. (quoting *Kow*, 58 F.3d at 427). To reach its holding, the *Meek* court also explained that the government provided a "reasonably detailed" description of the items to be seized. *Id*. at 716. The court described that "[t]he proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *Id*.

Similar to the warrant in *Meek*, the government here provided a reasonably detailed description of the items to be seized in Attachment B and set out an objective procedure to guide the executing law enforcement agents' identification of items subject to seizure. *Id.* The warrant

clearly stated what it sought, i.e. "documents, business records, photographs, audio or video recordings, communications, and any evidence of the ownership, custody, control of, and association with" the various entities and individuals pertinent to the fraud scheme. Docket No. 190-1 (Warrant Affidavit). Additionally, under the circumstances, the government's warrant was sufficiently specific. The record shows that as of the issuance of the warrant, the government provided the list of the names and entities "without description of their potential role" in order "not to unnecessarily reveal all aspects of the investigation or otherwise prejudice any party." Dkt. No. 190 (Neeley Decl. ¶ 95). Further, at the time of the issuance of the warrant, the government was not required to describe the items to be seized with more particularity. *See e.g.*, *Banks*, 556 F.3d at 973 (explaining that "[a]lthough the government may have known the name of certain files that supported the finding of probable cause, there is no requirement that the warrant be tailored to obtain only that evidence already known to exist. In fact, this heightened limitation has been specifically rejected."). Because Madjlessi served as the primary construction contractor for the PLV project as a whole, it was sufficiently reasonable for the government not to distinguish between PLV East and PLV West portions of the project. Therefore, the Court finds Lonich's argument concerning a missing distinction between PLV East and West unpersuasive. The search warrant was sufficiently specific to meet the Fourth Amendment particularity requirement.

### C. Good-Faith Reliance

The government argues that even if Lonich's overbreadth claims have merit, it is entitled to the good-faith exception pursuant to *United States v. Leon*, 468 U.S. 150 (1984). Because the Court finds that the April 2014 search was valid, it will not address the good faith exception under *Leon*.

## II. Compliance with Terms of the Search Warrant

*United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), addresses the wholesale seizure of documents for an off-site search and establishes a procedure to be followed when documents to be seized are intermingled with other documents. ". . . [T]he wholesale seizure for later detailed

14

examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the Fourth Amendment was designed to prevent.'" *Id.* at 595. Consequently, "the essential safeguard required is that wholesale removal must be monitored by the judgment of a neutral, detached magistrate." *Id*. at 596.

Lonich argues that the government has not established compliance with the warrant's protocol as described in Attachment C. Specifically, Lonich contends that the government failed to file a search warrant return within 14 days and failed to return five seized devices within the 60-day deadline, as prescribed by the warrant. He relies on *Tamura* and *United States v. Comprehensive Drug Testing, Inc*. ("*CDT*"), 621 F.3d 1162, 1172 (9th Cir. 2010) (holding that the government's seizure was in disregard of the Fourth Amendment because the seizure reached information not covered by the warrant and because the government "utterly failed to follow the warrant's protocol.").

The government concedes that it did not meet the 14-day return deadline and instead filed a return three months after the search. The government explains that this "oversight" occurred because "there was confusion as to who was responsible for the return between the trial team, who had taken the lead on obtaining the search warrant, and the taint team, who had taken the lead on processing the evidence obtained." Dkt. No. 190 at 12 (Neeley Decl.). While apologizing for this error, the government argues that this non-compliance is without prejudice to Lonich because the day of the search, the agents conducting the search created a contemporaneous log of all seized items and delivered a copy of the log to Lonich. Dkt. No. 187 (Balogh Decl.), Ex. E. The government asserts that Lonich was effectively provided with a return on the very day of the search. Dkt. No. 190 at 12 (Wilbur Decl.).

The government also acknowledges that it failed to promptly return the five devices that the agents were not able to read on site, and which were consequently removed off-site during the execution of the search. Pursuant to the protocol laid out in Attachment C, the government was required to return the devices within 60 days of seizure. Dkt. No. 190-1 (Warrant Affidavit). Additionally, the government was required to "file a return with a magistrate judge that identifies with particularity the removed device . . . within 14 calendar days of the execution of the search

15

warrant." *Id.* The government explains, "[u]nfortunately, Special Agent Wilbur forgot about the unreadable devices until, in preparation of this opposition, they came back to his attention. These devices have now been sent for return, clearly outside the 60 day deadline imposed by Attachment C." *Id.* at 13. Despite this failure, the government contends that the oversight does not merit relief from the Court because these five devices were never searched and, hence, yielded nothing to suppress. *Id.*

While the Court is disturbed by the errors committed by the government, the record reflects that those errors were the result of negligence rather than intentional misconduct. The Court also agrees with the government that Lonich has not been prejudiced by the government's conduct. The *CDT* case upon which Lonich relies is distinguishable. In *CDT*, the Ninth Circuit held that the warrant procedures were "completely ignored" by the government, and that those violations led to the illegal seizure of evidence outside the scope of the warrant. *CDT*, 621 F.3d at 1171.

## III. Evidentiary Hearing

A defendant may challenge a facially valid search warrant affidavit by showing that (1) a false statement was, knowingly and intentionally or with reckless disregard for the truth, included in the warrant affidavit, and (2) that the allegedly false statement was necessary to the finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Putney*, 906 F.2d 477, 478 (9th Cir. 1990). A non-conclusory "substantial preliminary showing" of these facts entitles the defendant to an evidentiary hearing. *Franks*, 438 U.S. at 171-72. If the allegation of reckless disregard or perjury is established by a preponderance of the evidence at a hearing, then the false statements must be stricken and the affidavit's remaining content reviewed to determine whether it is sufficient to establish probable cause. *See id.* at 156. If it is not, then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* In addition to the inclusion of false statements, reckless or knowing omissions from the affidavit that tend to mislead may also constitute a *Franks* violation. *See United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988).

A defendant seeking an evidentiary hearing must satisfy five requirements:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; (5) the challenged statements must be necessary to find probable cause.

*United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (quoting *United States v. DiCesare*, 765 F.2d 890, 895 (9th Cir. 1985)). A defendant is not entitled to a *Franks* hearing if, setting aside the alleged misstatements and omissions, "there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 U.S. at 171-72.

Lonich requests a *Franks* hearing based on the assertion that Special Agent Neeley made material misstatements and omissions that undermine Magistrate Judge Spero's finding of probable cause. Lonich's first argument is that Neeley deliberately omitted from his affidavit material facts that show that J.H., and not Madjlessi, was the actual owner of 101 Houseco. Lonich contends that Neeley omitted the following facts: (1) that J.H. "personally applied for and personally guaranteed the SVB loans made to 101 Houseco;" (2) that when evaluating the 101 Houseco loans, SVB relied on J.H.'s personal application and assets; (3) that J.H. told Neeley that "while he agreed to let Lonich and Madjlessi manage the 101 Houseco project, he was, in fact, the owner of 101 Houseco;" (4) that J.H. "personally authorized, in writing to SVB, Madjlessi and Attorney Lonich to negotiate with the bank on behalf of 101 Houseco;" (5) that John Barr informed the government's investigators that Madjlessi's company manages 101 Houseco for its owners and that "the purchase was an arms-length transaction reviewed by the bank's attorney;" and (6) that "[t]he five-year investigation uncovered no documents reflecting that Bijan Madjlessi ever obtained, possessed or maintained any ownership interest in 101 Houseco, up and through his death in 2014." Dkt. No. 186 (Balogh Decl. ¶ 24). Lonich's second argument is that Neeley purposely omitted material evidence that demonstrates that the Asset Verification Letters ("AVLs"), which were used by Lonich and Cutting to secure financing from Fannie Mae and Freddie Mac, were not fraudulent. Dkt. No. 186 at 32. Lonich claims that Neeley uncovered evidence that these AVLs were merely "promises to fund loans, promises which fell within

17

Cutting's authority . . . " yet failed to include this information for the magistrate judge. Dkt. Nos. 186 at 32, 196 at 16. Without these material facts, Lonich argues, Magistrate Judge Spero would have rejected the warrant application for lack of probable cause. Dkt. No. 196 at 17.

The government responds that Lonich's first allegation is without merit, as the Court has previously rejected the claim that J.H. was not a straw purchaser. As to Lonich's second argument, the government asserts that the AVLs were "false on their face despite what other interested parties may have opined about them,"[4] and that Lonich's evidence "do[es] not amount to any substantial showing of meaningful omissions." Dkt. No. 190 at 14. The government points out that two of Ms. Brajkovich's AVLs, for example, asserted that the she presently "has" "sufficient funds" to "fund that purchase in full." *Id.*, Ex. F. The government contends that these AVLs were false since Ms. Brajkovich's SVB account was overdrawn by $8,160.99. *Id.* According to the government, this shows that even if supplemented by the facts Lonich claims were omitted, the AVLs are still false.

The Court has previously rejected Lonich's claim that J.H. was the actual owner of 101 Houseco and will not consider it anew. *See* Dkt. No. 162. The Court explained the charges in the indictment as follows:

> Madjlessi, Melland, Cutting and Lonich conspired to have Madjlessi bid on and obtain this defaulted loan contrary to FDIC regulations and through a straw borrower, J.H. Indictment ¶ 89. In March 2009, Lonich created an entity called 101 Houseco, and installed J.H. as its nominal owner. *Id.* ¶ 10. In fact, J.H. was a straw buyer who exercised no meaningful control of 101 Houseco; instead, Madjlessi and Lonich exerted control over the company. *Id.* In March 2009, J.H. signed a document effectively assigning his ownership interest in 101 Houseco to Madjlessi's daughter at any time upon her signature. *Id.*

*Id.* at 3. As to Lonich's second claim, the Court finds no evidence that Special Agent Neeley knowingly and intentionally, or with reckless disregard for the truth, omitted facts to mislead Magistrate Judge Spero in the issuance of the warrant. Nothing in the record demonstrates that the

---

[4] In its Opposition, the government also concedes that the warrant affidavit included a "potentially misleading statement" concerning the AVLs. Dkt. No. 190 at 15. The individuals listed under numbers (4) and (6) in Neeley's affidavit as two separate people were actually one person. *Id.* Neeley explains this error as follows: "[m]y description of the individual as both Subject D and CS was inadvertent, and I did not realize I had made the mistake until last week during preparation for this declaration." Dkt. No. 190-5 at 4 (Neeley Decl. ¶ 7).

alleged omissions concerning the AVLs were "the result of anything other than negligence or innocent mistake." *United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995). Further, even if supplemented by the alleged omissions, the AVLs would not defeat the finding of probable cause. *Franks*, 438 U.S. at 155-56.

## CONCLUSION

Accordingly, Lonich's motion to suppress evidence and for a *Franks* hearing is DENIED.

**IT IS SO ORDERED**.

Dated: April 15, 2016

_____
SUSAN ILLSTON
United States District Judge

19