1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

SEAN CUTTING, BRIAN MELLAND, and
DAVID LONICH,

Defendants.

Case No.  14-cr-00139-SI-1

**ORDER GRANTING DEFENDANT
CUTTING'S MOTION TO DISMISS
THE SUPERSEDING INDICTMENT;
DENYING DEFENDANT CUTTING'S
OTHER MOTIONS RE: SUPERSEDING
INDICTMENT AS MOOT; DENYING
DEFENDANT CUTTING'S MOTION
FOR DISCLOSURE OF GRAND JURY
TRANSCRIPTS**

Re: Dkt. Nos. 268-271, 273, 287, 291

On December 20, 2016, the Court held a hearing on numerous motions filed by defendants. For the reasons set forth below, the Court GRANTS defendant Cutting's motion to dismiss the second superseding indictment; DENIES defendant Cutting's motion to strike the omissions theory from Counts 1, 2, and 11 as insufficiently pleaded; DENIES defendant Cutting's motion to strike surplusage from paragraph 19  and Counts 14-20; DENIES defendant Cutting's motion to dismiss Counts 1 and 11 as time-barred; and DENIES defendant Cutting's motion for disclosure of grand jury transcripts.[1]

---

[1]  The Court will issue a separate order on the motions for disclosure and identification of exculpatory evidence filed by defendants Cutting and Lonich, as well as Lonich's further motion to suppress.

United States District Court
Northern District of California

**BACKGROUND**

On March 18, 2014, the government filed a twenty-nine count indictment against defendants David Lonich, Brian Melland and Sean Cutting.[2]  Melland, Cutting and Lonich were charged with conspiracy to commit wire and bank fraud in violation of 18 U.S.C § 1349 (Count 1), bank fraud in violation of 18 U.S.C. § 1344 (Count 2), wire fraud in violation of 18 U.S.C. § 1343 (Counts 3 through 8), conspiracy to make false statements to a bank in violation of 18 U.S.C. § 371 (Count 9), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 10), and money laundering in violation of 18 U.S.C. § 1957 (Counts 11 through 22).  Melland and Cutting were charged with conspiracy to misapply bank funds in violation of 18 U.S.C. § 371 (Count 23).  Cutting and Lonich were charged with making false bank entries in violation of 18 U.S.C. § 1005 (Counts 24 through 28), and Lonich alone was charged with attempted obstruction of justice in violation of 18 U.S.C. § 1512 (Count 29).  Madjlessi was a real estate developer, Lonich was Madjlessi's attorney, Cutting was President and CEO of Sonoma Valley Bank ("SVB") until it failed in August 2010, and Melland was the Senior Vice President and Chief Loan Officer of SVB until March 2010.

I.       **The original indictment**

According to the original indictment, SVB was a bank based in Sonoma County, California, which failed in or about August 2010. Dkt. No. 1 ¶ 6.  Until it failed, it was insured by the Federal Deposit Insurance Corporation ("FDIC") and was a member of the Federal Home Loan Bank of San Francisco.  *Id.*  SVB received $8.65 million in funds from the Troubled Asset Relief Program ("TARP") and failed to pay all of the required dividends on that investment.  *Id.*  After SVB failed, it did not repay the funds it had received from TARP.  *Id.*  When it failed, SVB had multiple outstanding loans to Madjlessi and his associated entities, including a loan related to the Park Lane Villas project.  *Id.*

---

[2]  Bijan Madjlessi was originally charged in the indictment with the other defendants. Madjlessi died after the indictment and by operation of law all charges against him were dismissed.

The original indictment alleged a single "scheme to defraud" involving an entity called 101 Houseco.  The original indictment alleged:

The Scheme to Defraud

7. From no later than approximately March 2009 until approximately September 2012, the defendants devised and executed a material scheme to defraud Sonoma Valley Bank and others and to obtain money from Sonoma Valley Bank and others by means of materially false and fraudulent pretenses, representations, and promises and by omissions and concealment of material facts.  Specifically, the defendants worked to obtain a loan for an entity called 101 Houseco, LLC ("101 Houseco") falsely claiming that company was controlled by J.H., but knowing that J.H. was a straw and that 101 Houseco was actually controlled by MADJLESSI and LONICH. The defendants used the proceeds of the loan to purchase from the FDIC the rights to a prior loan on which MADJLESSI had defaulted. This allowed MADJLESSI to gain ownership and control of PLV East,[3] and ultimately to refinance that property at a favorable interest rate through federal government lender Freddie Mac in September 2012.

*Id.* ¶ 7.

In or around April 2008, Madjlessi defaulted on an IndyMac Bank loan of more than $30,000,000 that he had personally guaranteed and that had been used to fund construction of PLV East.  *Id*. ¶ 8.  In May 2008, IndyMac Bank filed a civil lawsuit seeking recovery of the loan proceeds.  *Id*.  By July 2008, IndyMac Bank had failed.  *Id*.  The FDIC took over as Receiver and decided to auction the loan through a contractor, The Debt Exchange, also known as DebtX.  *Id*.

Madjlessi, Melland, Cutting and Lonich conspired to have Madjlessi bid on and obtain this defaulted loan contrary to FDIC regulations and through a straw borrower, J.H.  *Id*. ¶ 9. In March 2009, Lonich created an entity called 101 Houseco, and installed J.H. as its nominal owner.  *Id*. ¶ 10.  In fact, J.H. was a straw buyer who exercised no meaningful control of 101 Houseco; instead, Madjlessi and Lonich exerted control over 101 Houseco.  *Id*.  In March 2009, J.H. signed a document effectively assigning his ownership interest in 101 Houseco to Madjlessi's daughter at any time upon her signature.  *Id*.

To fund the bid for the defaulted IndyMac loan, Madjlessi approached SVB executives Melland and Cutting seeking a loan for 101 Houseco.  *Id*. ¶ 11.  Melland and Cutting knew that 101 Houseco was a straw purchaser, and they took steps to authorize that loan, which was initially

---

[3]  The Park Lane Villas real estate development was a mixed-use development in Santa Rosa, California, with two phases, the West and the East.  *Id.* ¶ 5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  disbursed to 101 Houseco in March 2009.  *Id*.  Between March 2009 and November 2009, with

2  Melland and Cutting's assistance, the loan balance to 101 Houseco increased from an initial

3  balance of less than $5,500,000 to a final balance of almost $9,500,000.  *Id*.  Of the final balance,

4  more than $4,000,000 was used to purchase Madjlessi's defaulted IndyMac loan through DebtX

5  and more than $4,500,000 went to Masma Construction, a company controlled by Madjlessi.  *Id*.

6  "In or about January 2010, MADJLESSI and LONICH, utilizing J.H., caused 101 Houseco to

7  settle the pending civil suit relating to that loan with MADJLESSI, foreclose on PLV East, and

8  obtain title to the project."  *Id*. ¶ 12.

9       In order to obtain Freddie Mac refinancing, between approximately 2009 and 2011,

10  Madjlessi, Lonich, and Cutting took steps to purchase PLV East units that had been sold as

11  residential condominiums prior to the start of this scheme and then transfer them to 101 Houseco

12  so that the residential portion of PLV East could be converted to an apartment complex.  *Id*. ¶ 13.

13  Madjlessi and Lonich helped accomplish these purchases by fraudulently utilizing straw

14  purchasers and by obtaining a loan from a New York-based firm for 101 Houseco by fraudulently

15  utilizing J.H. as a straw borrower.  *Id*.  Cutting "helped accomplish the purchases by issuing letters

16  on SVB letterhead falsely stating that potential buyers had sufficient funds available at SVB for

17  purchase."  *Id*.   In or about September 2012, Madjlessi and Lonich obtained refinancing on the

18  PLV East from Freddie Mac.  *Id*. ¶ 14.

19       Defendants Lonich, Cutting and Melland moved to dismiss and strike the original

20  indictment on numerous grounds.  In an order filed January 27, 2016, the Court granted in part and

21  denied in part the defendants' motions.  Dkt. No. 162.  Among other things, the Court struck the

22  language "and others" from the prefatory language of the indictment, as well as Counts 1 and 3

23  through 8 (the conspiracy to commit wire and bank fraud and substantive wire fraud allegations).

24  Those counts alleged a "material scheme to defraud Sonoma Valley bank *and others* and to obtain

25  money from Sonoma Valley Bank *and others*."  Dkt. No. 1 at ¶ 7 (emphases added); *see also id*.

26  ¶¶ 17, 21.  The Court held,

27       [T]he indictment here is open-ended and unclear as to the number of victims.  The
         Court finds that under these circumstances, it is appropriate to strike "and others"
28       from these portions of the indictment.  If the government wishes to supplement the

4

indictment with additional information about the victims, it may do so.  The Court notes that the government may add more information about the victims without identifying them by name . . .

Dkt. No. 162 at 11:11-15.

The Court also granted defendant Lonich's motion to dismiss Counts 1 through 8 (conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 1349; bank fraud in violation of 18 U.S.C. § 1344; and wire fraud in violation of 18 U.S.C. § 1343) to the extent those counts were predicated on a scheme to defraud by omission.[4]  The Court agreed with Lonich that if the government wished to prosecute based upon an omissions theory, the indictment must allege that defendant owed a duty to disclose the omitted information.  *Id*. at 11-13.

At a status conference held on May 19, 2016, the Court set a trial date of March 20, 2017. Dkt. No. 222 (minutes of May 19, 2016 hearing).[5]  At that hearing, Lonich's attorney requested that a deadline be set for the filing of a superseding indictment in order to allow defendants sufficient time to prepare for trial on any charges included in the superseding indictment.  Dkt. No. 229 at 22:5-21 (transcript of May 19, 2016 hearing).   In response, counsel for the government requested that the Court not set a deadline at that time.  Mr. Rees stated, "I think we should table that partly because just because I − I wouldn't feel responsible returning a superseding indictment, which we have to do, in part, because of the Court's orders, until at least I get access or potential. And I'm not saying I expect anything earth shattering, but if something is in there that we would want to use, it would be a waste of everybody's time to supersede soon and then have to potentially do it again."  *Id*. at 22:22-23:6.  The Court agreed to address the issue at a later status conference.  *Id*. at 23:27.  At a hearing on August 5, 2016, the Court directed the government to file a superseding indictment prior to the October 28, 2016 status conference so the parties could have a chance to review the superseding indictment and be prepared to discuss it.  Dkt. No. 242 (minutes of Aug. 5, 2016 hearing).

---

[4]  The only specific omission alleged in the original indictment was found in Paragraph 15(f), which alleged that "while negotiating and obtaining refinancing for PLV East, [defendants] omitted the material fact 101 Houseco and this scheme were subjects of a criminal investigation[.]"  Dkt. No. 1 ¶ 15.

[5]  The factors that went into selecting the trial date are discussed *infra*.

United States District Court
Northern District of California

## II.     The superseding indictment

The government filed a superseding indictment on October 27, 2016.  Dkt. No. 249.  The superseding indictment contains 34 counts and alleges two "schemes to defraud."  The superseding indictment alleges that the first scheme to defraud occurred from approximately 2007 until approximately 2010, and that during this period the three defendants "carried out a scheme to defraud whereby money from Sonoma Valley Bank was paid and directed to Madjlessi, and persons and entities controlled by Madjlessi, that exceeded the legal lending limits within which the Bank was required to operate by its policies and procedures, the Board of Directors, the FDIC and the [California Department of Business Oversight, Division of Financial Institutions]."  Dkt. No. 242 ¶¶ 16-17.  The superseding indictment alleges that "[w]hen the loan amounts from Sonoma Valley Bank for loans directly to Madjlessi and his entities approached the legal lending limits, the defendants schemed to use so-called 'straw borrowers' and nominees to conceal additional loans to Madjlessi, and persons and entities controlled by Madjlessi, that otherwise exceeded the legal lending limits within which the Bank was required to operate for individual borrowers like Madjlessi."  *Id*. ¶ 18.  The superseding indictment alleges that defendants caused SVB to lend a total of approximately $28 million to Madjlessi and the people and entities controlled by him, and that this "excessive and illegal concentration of lending . . . significantly contributed to the failure of [SVB]."  *Id*. ¶¶ 21-22.  The superseding indictment also alleges that as result of the failure of SVB, "the FDIC estimates that there have been approximately $11.47 million in losses to the FDIC Deposit Insurance Fund."  *Id*. ¶ 15.

The superseding indictment alleges that the "manner and means" of the first scheme to defraud included the loan to 101 Houseco, and contains new allegations regarding six loans involving the Petaluma Greenbriar real estate project, which was a set of 28 apartment units in Petaluma, California.  *Id*. ¶¶ 8, 24-26. The superseding indictment alleges that between December 2007 and April 2008, defendants Cutting and Melland caused SVB to issue six loans to different entities (Petaluma Greenbriar Investments 1, LLC; Petaluma Greenbriar Investments 2, LLC; and Petaluma Greenbriar Investments 5, LLC), and that Cutting and Melland concealed from the loan

committee that Madjlessi controlled the loan recipients, that Madjlessi was the beneficiary of most of the loan funds, and that Madjlessi made all of the interest payments on the loans. *Id.*

The counts related to the "first scheme to defraud" include: (1) Count 1, conspiracy to commit bank fraud and falsifying bank entries and reports in violation of 18 U.S.C. § 371, against all defendants; (2) Count 2, bank fraud in violation of 18 U.S.C. § 1344, against all defendants; (3) Counts 3-10, false bank entries and reports in violation of 18 U.S.C. § 1005, different counts against different defendants; (4) Count 11, conspiracy to misapply bank funds and make false statements to the FDIC in violation of 18 U.S.C. § 371, against defendants Cutting and Melland; (5) Count 12, misapplication of bank funds in violation of 18 U.S.C. § 656, against defendants Cutting and Melland; and (6) Count 13, false statements to the FDIC in violation of 18 U.S.C. § 1007, against defendants Cutting and Melland.

The superseding indictment alleges the following with regard to the new "second scheme to defraud":

> From in or about 2009 through in or about 2012, the defendants devised and executed a material scheme to defraud The Debt Exchange, as an agent of the FDIC, members of the public doing business with The Debt Exchange, and Freddie Mac; and Terra Capital Partners and CBRE Capital Markets, Inc., each an affected financial institution, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and by concealment and omission, with a duty to disclose, of material facts.

> Specifically, the defendants conspired to obtain a loan for an entity known as 101 Houseco, LLC ("101 Houseco") by falsely claiming that 101 Houseco was controlled by J.H., a person known to the Grand Jury, when, in fact, J.H. was a straw borrower and a nominee used by the defendants to conceal that Madjlessi and LONICH, and entities controlled by Madjlessi and LONICH, controlled 101 Houseco, and Madjlessi and LONICH where the principal beneficiaries of the transactions relating to 101 Houseco. The defendants used the proceeds of the loan by Sonoma Valley Bank to 101 Houseco to purchase from the FDIC the rights to a prior loan on which Madjlessi had defaulted.

> By in or about September 2012, this scheme to defraud enabled Madjlessi and LONICH to gain ownership and control of PLV East, and ultimately to refinance the property at a favorable interest rate through Freddie Mac, a government-backed federal lender.

*Id.* ¶¶ 47-49.

The counts related to the "second scheme to defraud" include: (1) Count 14, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, against all defendants; (2) Counts 15-20, wire

United States District Court
Northern District of California

fraud in violation of 18 U.S.C. § 1343, against all defendants; (3) Count 21, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); and (4) Counts 22-33, money laundering in violation of 18 U.S.C. § 1957, against all defendants.

As with the original indictment, Lonich is charged with attempted obstruction of justice in violation of 18 U.S.C. § 1512(c) (Count 34).

## III.    Discovery

As of December 6, 2016, the government had produced over 3.3 million pages of documents to defendants.  Dkt. No. 297 ¶¶ 5-6 (Rees Decl.); Dkt. No. 316 at 1:21 (Cutting's Reply).[6]  According to defendant Cutting's counsel, the produced discovery covers a time frame that spans over a decade and encompasses materials collected from hundreds of different witnesses, state and federal government agencies, banks, and companies.  Dkt. No. 271-1 ¶ 9 (Stephens Decl.).  The government began producing documents on July 1, 2014, and made additional productions throughout 2014, 2015 and 2016.  In one of those productions on January 30, 2015, the government gave notice that it was "in possession of a forensically copied hard drive of materials taken by the FDIC the night Sonoma Valley Bank failed."  Dkt. No. 271-3, Ex. F. The government's January 30, 2015 letter continued, "We believe that all of the materials have been produced to you.  However, the hard drive is available to you to review." *Id.*

At an October 28, 2016 status conference, the prosecutor informed the Court that the government was almost done producing discovery, and that the government had, on that day, produced three banker's boxes (approximately 3,000 pages) "of material related largely to [the new charges regarding the second scheme to defraud the] FDIC, as I mentioned.  That's our one

---

[6]  In some of Cutting's papers, he states that the government has produced over 3.8 million documents (based on the bates numbers of the documents).  *See, e.g.*, Dkt. No. 271-1 ¶ 9 (Stephens Decl.).  Thus, the record is unclear how many documents the government has produced, perhaps in part because the government's production has been ongoing.

The government has also produced additional documents to defendant Lonich that have been the subject of ongoing litigation regarding whether those documents are privileged and outside the scope of the warrant.  Those documents have not yet been produced to Cutting and Melland.  The Court will rule on Lonich's further motion to suppress those documents, and the disposition of that motion may result in further documents being produced to Cutting and Melland.

United States District Court
Northern District of California

new criminal charge." Dkt. No. 271-2, Ex. A at 6:20-22 (Oct. 28, 2016 hearing transcript). The prosecutor also stated, "We have a little bit left to go, but it's in the order of less than five boxes, we believe, and we expect to be able to produce those in the next week or two." *Id*. at 6:23-24. In response to counsel for Lonich's request for deadline for the production of all discovery, the prosecutor stated that he opposed setting a deadline but that, "I expect within the next two weeks to have everything, even related to the new stuff, turned over." *Id*. at 12:15-18. The Court set a deadline of December 1, 2016 for the production of all exculpatory evidence and all evidence the government intended to use at trial, subject to a good cause exception for discovery produced after that date. *Id*. at 13:5-16.

Although the government represented at the October 28, 2016 hearing that there were not more than 5 additional boxes of outstanding discovery, the same day the government gave defense counsel an "Investigations Inventory" that indicated it had another 23 boxes of hard copy documents, plus 15 disks containing electronic information "available for review." Dkt. No. 271-1 ¶ 3, Ex. B.[7] The descriptions on the Investigations Inventory reflect that the FDIC obtained

---

[7] At a hearing on November 18, 2016, defense counsel informed the Court that the October 28, 2016 Investigations Inventory listed an additional 23 boxes and 15 disks, not the 5 boxes that the government had represented at the October 28 hearing. In response, Mr. Rees stated, "I didn't know about that deadline [the December 1, 2016 deadline to produce exculpatory evidence and evidence to be used at trial] when I made the representations about the five additional boxes, so we, of course, went back and burned the barn down, and we are getting every discovery that we can possibly imagine that they could possibly need. We continue to do that." Dkt. No. 279, Ex. E at 13:11-18 (Nov. 18, 2016 transcript). Based upon Mr. Rees' statements at the November 18 hearing, combined with a December 23, 2016 declaration filed by Mr. Rees explaining how the government has obtained the FDIC materials that it has produced in this litigation, it is the Court's understanding that the 23 boxes were obtained by the government by a trial subpoena Mr. Rees issued on November 4, 2016; that those boxes have since been produced to defendants (over counsel for Lonich's objection); and that although Mr. Rees had previously represented in January 2015 that the government had produced all of the materials taken by the FDIC when SVB failed in 2010, that in fact was not correct, as Mr. Rees subsequently learned. *See generally* Dkt. No. 332 ¶¶ 3-7 (Dec. 23, 2016 Rees Decl.). (It is not clear to the Court whether the 15 disks listed in the Investigations Inventory have been produced, how much material those disks contain, or if those disks contain the additional voluminous material that the government asserts is irrelevant to this case because it contains material such as depositor account records.)

Mr. Rees' December 23, 2016 declaration states, *inter alia*, that (1) the material from the FDIC produced to the defendants in January 2015 was originally provided to Special Agent John Carrillo of the FDIC-OIG by employees or contractors of the FDIC prior to May 2012; (2) on March 17, 2014, Mr. Rees issued a grand jury subpoena to the FDIC-R for SVB, seeking "any and all records related to Sonoma Valley Bank which was taken into receivership by the FDIC on August 20, 2010. The records shall include [specific forensically captured records such as Cutting and Melland's desktops]"; (3) according to Special Agent Carrillo, the March 17, 2014 grand jury

these documents when SVB closed in August 2010.  *Id.*  The October 28, 2016 Investigations Inventory sparked a series of letters and emails between the parties with defense counsel seeking to clarify whether the 23 boxes and 15 disks had been previously produced (they had not).  Those exchanges led to further revelations by the government, namely that there was even more voluminous material in the FDIC-Receiver's possession that was seized by the FDIC-R when SVB failed in 2010 that had not been produced to defendants.  According to the government, that additional voluminous material, which the prosecutors overseeing this case do not possess and have not reviewed, is not relevant to this action.[8]

In support of the motion to dismiss, Cutting filed the declaration of Melanie White, the Senior Vice President of Discovery Solutions at Inventus, LLC.  Dkt. No. 271-4.  Inventus has been retained by Cutting's counsel to assist with the electronically-stored information ("ESI") produced by the government.  As detailed in the declaration of Ms. White, the government's ESI "suffers from a number of technical issues which materially degrade [defense counsel's] ability to search and review that discovery."  *Id*. ¶ 4.  Those issues include: (1) documents with searchable text files that do not match the image of the document, such as when the searchable text for a file contains the text of an email and its attachment, but there is no corresponding image of the attachment; (2) emails that are missing attachments; (3) families of documents, such as an email and its attachments, produced as standalone documents without metadata indicating that they are part of a family; (4) emails and attachments produced as a single document, which makes it

---

subpoena was requested in order to obtain "proper access" to the FDIC material already in DOJ custody and that had been provided to Carrillo prior to May 2012; (4) "At Special Agent Carrillo's request, the FDIC did not produce any additional material to agents as a result of the subpoena issued on March 17, 2014"; and (5) after Mr. Rees issued the November 4, 2016 trial subpoena, which sought "[a]ccess to all files seized by the FDIC from Sonoma Valley Bank upon its closure," Mr. Rees "then spoke with an employee of the FDIC-R and learned that the material in the government's possession was not a comprehensive copy of all the materials seized by the FDIC-R the day Sonoma Valley Bank failed.  I learned there was a voluminous amount of material in the FDIC-R's possession that the government did not possess.  I then orally limited the scope of the subpoena to include only a subset of potentially relevant employee emails, including those of defendants Cutting and Melland and bank employee Alexis Tomsen [who was involved in loan approval], and an electronic copy of documents contained in a number of boxes seized that Cutting sought access to through his attorney."  Dkt. No. 332 ¶¶ 3- 7.

[8]  Those FDIC materials are the subject of pending motions for identification of exculpatory evidence filed by defendants Cutting and Lonich.

difficult when running a search to determine which individual document (the email versus the attachments) contains the search term; (5) failing to insert page breaks at the end of documents and producing multiple unrelated documents together as a single document (e.g., ten documents that are two pages each produced as a single twenty-page document); and (6) multipage documents produced as single page "documents" (e.g., a four-page document produced as four separate one-page documents), thereby making it impossible to scroll through the entire document during review. *Id.* ¶¶ 5-17. Ms. White states that the magnitude and scope of these issues severely limit the ability of defense counsel to effectively search for, find and review documents within the ESI provided by the government, and that the scope of these problems cannot be ascertained without a manual review of all documents.

The government did not respond to any of Ms. White's specific statements regarding the problems with the government's ESI, except to state that the government has provided reformatted ESI to defendants upon request. Dkt. No. 297 ¶ 13. At the hearing on this matter, Cutting's counsel stated that these problems persist, while the government asserted that the problems have been corrected. However, the evidence before the Court consists of Ms. White's unrebutted declaration, and thus the Court accepts Ms. White's declaration as undisputed.

## DISCUSSION

## I. Defendant Cutting's motion to dismiss the superseding indictment

Defendant Cutting has moved to dismiss the superseding indictment on the ground that the government's delay in filing the superseding indictment violates his right under the Sixth Amendment to a speedy trial. Defendants Melland and Lonich join in the motion. Cutting argues that the superseding indictment dramatically alters the scope of this case by (1) adding new allegations regarding the Petaluma Greenbriar loans, which occurred several years before the 101 Houseco loan; (2) including allegations regarding a second scheme to defraud the FDIC; and (3) alleging for the first time that defendants Cutting and Melland caused the failure of SVB and allegedly caused the FDIC to suffer $11.47 million in losses. Cutting asserts that the government deliberately delayed in bringing these charges until months before trial, and that the record shows

that the government has been investigating the Petaluma Greenbriar loans and a scheme to defraud the FDIC since 2010-2011.  Defendant also argues that the prejudice inflicted by the addition of new charges is compounded by the facts that the government has recently produced a trove of new discovery, and because problems with the government's voluminous electronic discovery has severely impaired defense counsel's ability to search the over 3.3 million pages of discovery for evidence relevant to the new charges contained in the superseding indictment.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial."  In *Barker v. Wingo*, the U.S. Supreme Court set forth the following test for determining whether the government's delay violates the defendant's Sixth Amendment right: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

### A.      Length of delay

In *United States v. Gregory*, 322 F.3d 1157, 1161-62 (9th Cir. 2003), the Ninth Circuit held that a defendant seeking to dismiss an indictment on Sixth Amendment grounds must show that "the period between indictment and trial passes a threshold point of 'presumptively prejudicial' delay, and that delays "approaching one year are presumptively prejudicial."[9]  In *Gregory*, the defendant was first charged in the first superseding indictment, filed on October 28, 1999, and the government filed a third superseding indictment on March 14, 2001.  The defendant claimed that the government's delay in filing the third superseding indictment violated his rights under the Sixth Amendment.  The Ninth Circuit assumed without deciding that the delay should be measured from the date of the first superseding indictment to the date of trial (which was 22

---

[9]   The court noted, "Within this circuit, we have found that a sixth-month delay is a 'borderline case,' although we have also observed that there is a general consensus among the courts of appeals that eight months constitutes the threshold minimum."  *Id*. at 1162 n.3 (citations omitted); *see also Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (noting that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year.").

months), and the court held that a 22-month delay was presumptively prejudicial and therefore triggered the *Barker* inquiry.  *Id*. at 1162.

Here, the original indictment was filed on March 18, 2014, the superseding indictment was filed on October 27, 2016, and the trial is set for March 20, 2017.  Under *Gregory*, the length of delay would be measured at 36 months, and the government has conceded that the length of delay here is presumptively prejudicial and therefore triggers the speedy trial inquiry.  Dkt. No. 302 at 4.[10]  Thus, the Court finds that the length of delay weighs in favor of defendants, although the Court recognizes that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."  *Barker*, 407 U.S. at 531.

### B.    Reason for delay

The second factor is the reason for the delay.  In *Barker*, the Supreme Court stated,

> [D]ifferent weights should be assigned to different reasons.  A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531; *see also Doggett*, 505 U.S. at 656-57 ("Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. . . . Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.").  The "absence of any reason for the delay" weighs against the government.  *See McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003).

The government explains the reason for the delay in filing the superseding indictment as follows:

---

[10]   In his papers, Cutting argued that the length of delay is measured from the filing of the original indictment to the filing of the superseding indictment, which is 31 months.  The Court finds that whether the delay is measured as 31 months or 36 months, the length of delay is well over the presumptively prejudicial threshold.

United States District Court
Northern District of California

> [T]he need for the superseding indictment was raised nearly a year ago; the Court ordered the government to file any superseding indictment nearly four months ago; and the government complied with the Court's order.  Faced with the court-ordered need to cure allegations in the indictment, the government chose to add another Madjlessi real estate transaction and four more counts to the twenty-nine (29) existing counts.  That is commonplace for a case going to trial in four months and hardly a "radical" expansion of the original indictment "on the eve of trial" as the defendants claim.

Dkt. No. 302 at 5:14-20 (government's opposition).  Mr. Rees also states in his December 6, 2016 declaration,

> On January 27, 2016, in response to several motions to dismiss filed by the defendants, this Court issued an order granting, in part, some of those motions, but inviting the government to effectively cure certain issues the Court had identified in a superseding indictment.  *See* Dkt. 162.  This caused the government to consider bringing such a superseding indictment to cure those issues.  By May 17, 2016, the Court set a trial date in this matter of March 20, 2017.  On August 5, 2016, the Court set a deadline for the government to file a Superseding indictment by the status conference that occurred on October 28, 2016.  Because the case appeared that it would, indeed, go to trial at that point the government also began to consider ways in which a superseding indictment could help bring a more comprehensive case before a petite [sic] jury.  I have frequently both participated in and observed cases where more comprehensive and/or more serious charges, including those with mandatory minimum prison sentences, have been brought in a superseding indictment in anticipation of a jury trial, and would describe the practice as common.
>
> Beginning in the Spring of this year, our investigation began to focus on any misconduct by the defendants that may have affected Sonoma Valley Bank's primary federal regulator, the FDIC.  We began working with and subpoenaing information from FDIC enforcement personnel who had been involved with the presentation of the above-captioned 15 Day Reports.

Dkt. No. 297 ¶¶ 9-10.

There are a number of problems with the government's response.  First, the record before the Court shows that the government started investigating defendants' alleged misconduct affecting the FDIC well before 2016.  Defendant has submitted evidence of a July 10, 2012 memo from investigating case agents Terry Neely (SIGTARP),[11] John Carrillo (FDIC-OIG) and Jim Thiede (FHFA), and SIGTARP Deputy Chief Investigative Counsel John Sellers and Jeff Finigan to AUSA Tracie Brown in the U.S. Attorney's Office summarizing their investigation and recommending certain charges against defendants Cutting and Madjlessi.  Dkt. No. 336 ¶ 4

---

[11] Terry Neely submitted the affidavit in support of the search warrant application.

United States District Court
Northern District of California

(Stephens Reply Decl).[12]   According to Mr. Stephens' description of that memo in his declaration, that memo includes a section titled "Conspiracy to Defraud FDIC," and the memo alleges that Cutting concealed Madjlessi's relationship from the FDIC, and states that the FDIC found that the total loans by SVB to Madjlessi exceeded the bank's legal lending limit.  *Id.*

Similarly, the government has been investigating the Petaluma Greenbriar loans since 2010-2011.  Defendant has submitted evidence of a May 31, 2013 email from the lead SIGTARP agent, Terry Neely, to AUSA Rees and AUSA Reeves that included a summary of the potential charges to bring against Cutting.  That email stated that the agents intended to write up charges related to Petaluma Greenbriar.  *Id.* ¶ 9. Indeed, in 2013 the FDIC-R filed a civil enforcement action against Cutting, Melland and another SVB officer seeking to recover over $12 million in losses that SVB suffered on one commercial line of credit and ten commercial real estate loans, including the six Petaluma Greenbriar loans.  *See FDIC as Receiver v. Cutting et al.*, C 13-3834 RS, Dkt. No. 1 ¶¶ 49-64 (allegations regarding Petaluma Greenbriar loans).[13]   Further, the government collected most of the documents relating to the new allegations when SVB closed in August 2010.  *See* Dkt. No. 271-1 ¶ 3, Ex. B (Stephens Decl.). In addition, the records of witness interviews that the government has produced to date demonstrate that the government conducted most of its witness interviews between 2010 and 2014.  Thus, it is simply not accurate for the prosecution to state that "[b]eginning in the spring of [2016], the investigation began to focus on any misconduct by the defendants that may have affected Sonoma Valley Bank's primary federal regulator, the FDIC."  Dkt. No. 297 ¶ 10.

---

[12]   In his reply declaration, Cutting's counsel Mr. Stephens states that on December 5 and 6, 2016, he went to the U.S. Attorney's Office to review discovery, including agents' notes and communications with prosecutors, which the prosecutors made available for inspection but would not permit defense counsel to copy.  Mr. Stephens describes some of these documents, including the July 10, 2012 memo, in his reply declaration.  Dkt. No. 336 (Exhibits A-C to that declaration are filed under seal at Dkt. No. 324).

[13]   When this criminal case was filed, Cutting filed a notice of related case in the FDIC civil action.  Judge Seeborg found this case was not related to the action pending before him, presumably because the FDIC's action did not involve the 101 Houseco loans, and the original indictment in this case did not include the allegations regarding Petaluma Greenbriar or defrauding the FDIC.

Second, the government's response suggests that the Court required the government to file a superseding indictment, and that the government was simply complying with court orders and court schedules.   However, the Court did not order the government to file a superseding indictment; the government chose to do so in response to the Court's January 27, 2016 order.   The government asserts that the Court's January 27, 2016 order striking the words "and others" from the original indictment prompted the need to go back to the grand jury, and that if the Court had not struck that language, "the case probably would have proceeded to trial on the original indictment."   Dkt. No. 334 at 7:22-24 (transcript of Dec. 20, 2016 hearing).   However, while the new second scheme to defraud that is alleged in the superseding indictment does identify additional victims such as the FDIC, the new Petaluma Greenbriar allegations in the first scheme to defraud could not have been added to clarify the stricken "and others" language.   The prefatory language of the original indictment, as well as Counts 1 and 3 through 8 (the conspiracy to commit wire fraud and substantive wire fraud allegations), alleged a "material scheme to defraud Sonoma Valley bank and others and to obtain money from Sonoma Valley Bank *and others*."  Indictment at ¶¶ 7, 17, 21. (emphases added).   Defendant Lonich moved to strike "and others" on the ground that the indictment was unclear as the number of victims.   The Court's January 27, 2016 order struck "and others," and stated that "[i]f the government wishes to supplement the indictment with additional information about the victims, it may do so."   Dkt. No. 162 at 11:13-14.   The new allegations regarding the Petaluma Greenbriar loans do not add new victims; the victim with regard to those loans is still SVB.   Thus, it is not entirely accurate to state that the superseding indictment was brought in order to cure the defects identified by the Court's January 27, 2016 order.

Further, the government's suggestion that the superseding indictment simply responds to the Court's January 27, 2016 order appears to be an attempt to downplay the fact that the superseding indictment significantly expands the scope of the case by adding the allegations regarding the six Petaluma Greenbriar loans dating back to 2007-2008, by adding a second alleged scheme to defraud the FDIC and other financial institutions, and by alleging for the first time that

defendants caused SVB to fail and caused the FDIC to suffer $11.47 million in losses.[14]

Third, the government's response is notable for what it does not dispute. Defense counsel for Cutting filed a declaration stating that he repeatedly asked the prosecution about what it intended to include in the superseding indictment, and that in response the government stated that the superseding indictment would add context about Sonoma Valley Bank and never indicated that it would be adding new substantive counts involving additional fraudulent schemes. *See* Dkt. No. 271-1 ¶ 12 (Stephens Decl.); *see also* Dkt. No. 277 ¶ 16 (Balogh Decl.) ("Following the Court's issuance of its January 2016 Order regarding the defendants' various pleadings motion, during subsequent court appearances, I, along with defense counsel Neal Stephens and George Boisseau, engaged in conversations with AUSA Rees regarding the content and timing of the superseding indictment. In those conversations, AUSA Rees maintained that the superseding indictment would present new factual information to buff out or 'provide more detail' regarding co-defendants Cutting's and Melland's roles in the alleged conspiracy, that this was 'taking time,' and that he would file the superseding indictment by or in August 2016."). The government has not disputed these statements by defense counsel.

The Court finds that while some of the delay may have been prompted by returning to the grand jury to secure an indictment on the "other" victims, that does not explain the government's conduct in waiting until October 27, 2016 to file the charges contained in the superseding indictment. The record shows that the government began investigating the Petaluma Greenbriar loans in 2010-11 and the alleged scheme to defraud the FDIC no later than 2011-12. The government could have filed all of the charges contained in the superseding indictment when it filed the original indictment, and the government has not adequately explained why it did not do

---

[14] In addition, at the December 20, 2016 hearing the government argued that the superseding indictment did not add much to this case as evidenced by the fact that the discovery associated with the new charges is "incrementally small." Dkt. No. 334 at 9:12-14. However, on October 28, 2016, while the government represented that it had already produced 3 banker's boxes and would shortly produce less than 5 additional banker's boxes of new discovery associated with the new charges, in fact the government had produced 3 banker's boxes, and was in the process of producing at least 23 additional banker's boxes. While it is unclear exactly how much additional discovery has been produced as a result of the new charges, the government has not demonstrated that this amount is "incrementally small."

1    so.  *Cf. Gregory*, 322 F.3d at 1160, 1162 (government was negligent in waiting to investigate and

2    charge money laundering charges filed in superseding indictment when government could have

3    investigated those charges during original investigation of underlying drug charges alleged in

4    previous indictment).

5    This is not a case where new evidence has come to light that prompted the need to

6    supersede.  Rather, the government simply chose to seek indictment on some of the charges of

7    which it was aware, while holding back on others.  Then later − much later, some 31 months later

8    − it decided to supersede to add the charges it had been holding back, including a new conspiracy

9    and new substantive charges.  Although the Court does not find bad faith on the part of the

10   government, the Court does find that the government acted deliberately and intentionally with

11   regard to charging the new crimes added in the superseding indictment.  This factor weighs in

12   favor of defendants.

13

14   **C.**      **Assertion of speedy trial right**

15   The parties agree that the third factor, the defendant's prompt assertion of his speedy trial

16   right, is neutral in this case and does not weigh for or against defendants.  The government asserts

17   that "it bears mentioning that, in this case, the defendants have routinely waived their speedy trial

18   rights and time remains on the speedy trial clock."  Dkt. No. 302 at 6:2-3.  Cutting responds that

19   the government ignores important context, namely that the government produced more than three

20   million pages of discovery and repeatedly sought more time to have the government's taint team

21   review documents seized from Mr. Lonich in April 2014 (and that litigation is ongoing).  Cutting

22   asserts, and the Court agrees, that defendant is not precluded from asserting a Sixth Amendment

23   challenge based on the fact that he agreed to certain continuances in order to have adequate time to

24   attempt to review the voluminous discovery produced to date.  *See United States v. Ramirez-*

25   *Cortez*, 213 F.3d 1149, 1156 (9th Cir. 2000) (holding defendant did not forfeit his right to invoke

26   the Speedy Trial Act by stipulating to the continuance).

27

28

United States District Court
Northern District of California

18

United States District Court
Northern District of California

### D.     Prejudice

The final *Barker* factor is prejudice.   In *Doggett*, the Supreme Court explained that "unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence."  505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532).  The Court noted that "[o]f these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'"  *Id.* (quoting *Barker*, 407 U.S. at 532).

Defendant argues that because the government intentionally waited almost three years to file the superseding indictment, he is not required to show that he experienced "actual prejudice" to prevail under *Barker*.   Defendant also notes that the "presumption that pretrial delay has prejudiced the accused intensifies over time." *McNeely*, 336 F.3d at 831; *see also Doggett*, 505 U.S. at 655 ("[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or, for that matter, identify."); *Barker*, 407 U.S. at 532 ("[I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'").

Defendant also contends, however, that he has suffered actual prejudice.  Defendant argues that the government's delay in filing the superseding indictment impairs his defense because witnesses' recollections about core events at issue have diminished over time.

The   government   acknowledges   that   fading   witness   memories   "is   an   important consideration that should be weighed by the Court."  Dkt. No. 302 at 6:25-26.  But the government asserts,

> Claims about diminished witness memories would resonate more if the defendants had not agreed in May 2016 to a trial still four months in future in March 2017. An argument can be made that the defendants sought a trial ten (10) months in the future to achieve their own delay. Even if that is not the case, there is nothing about the delay between filing of the original indictment and the filing of the Superseding Indictment that further compounds witness memory issues when the trial is set to begin four months from now on the date to which the defendants agreed. Like many cases, witness memory may be an issue at trial, but that issue is inherent in the schedule the defendants sought, and not any actual prejudice owing to the delay

between the original indictment and the Superseding Indictment. *Gregory*, 322 F.3d at 1163 (original emphasis).

*Id*. at 7:6-14.  However, as defendant notes, the record reflects that at the May 17, 2016 status conference, counsel for Mr. Lonich began by requesting the earliest possible trial date available. Dkt. No. 229 at 4:8-14 (transcript of May 17, 2016 conference).  Mr. Rees stated that due to his trial schedule in 2016 and early 2017, he was requesting a trial date in spring 2017.  *Id*. at 5:5-12. Mr. Melland's counsel indicated that he had a trial set in January 2017 before this Court that impacted his schedule.  *Id*. at 4:19-23.  Counsel for Mr. Lonich suggested that the U.S. Attorney's Office could have another prosecutor handle the trial in order to set an earlier date.  *Id*. at 5:13-17. Mr. Cutting's counsel stated that he was available either in December 2016 or spring 2017.  *Id*. at 6:9-12.  Based on counsel's availability as well as the Court's trial schedule, the Court set a March 20, 2017 trial date.  Thus, the Court finds that the record does not support the government's assertion that defendants sought to move the trial to March 2017 "to achieve their own delay."

The government also asserts that fading witness memories are less of a concern in this case because "[f]or better or worse, Sonoma Valley Bank kept a lot of records and, when it failed, those records passed to the FDIC. While the difficulties of synthesizing that amount of documentary evidence should not be discounted, the preservation and access to so much bank record evidence undercuts the defendants' claims that they have been meaningfully prejudiced by any delay owing to the filing of the Superseding Indictment."  Dkt. No. 302 at 7:18-22.

Assuming without deciding that the government's assertion that fading witness memories are of less concern in a document intensive case such as this one, the government's argument brings the Court to what the Court finds is the real prejudice inflicted by the filing of the superseding indictment in this case.  The government does not dispute that the material produced in this case has been extremely voluminous. Nor has the government disputed the factual showing made by Cutting regarding the significant problems with the quality of the ESI produced by the government that impairs the ability of defense counsel to search that voluminous discovery.  The significantly broadened scope of the superseding indictment will require all defense counsel to reexamine the over 3.3 (or 3.8) million pages of discovery produced to date to analyze how those documents relate to the new allegations regarding the six Petaluma Greenbriar loans and the

scheme to defraud the FDIC and other financial institutions.  If the government's production of electronic discovery had been flawless, this would be a considerable undertaking.  However, the record before the Court – which the government has not disputed in any meaningful way – shows that the government's electronic discovery production has been disorganized, of poor technical quality, and difficult to review.

In addition, in November 2016 the government produced an additional voluminous trove of documents from the FDIC – documents that have been in the government's possession since 2010 – and the government has notified the defendants of the existence of additional unproduced materials (as much as 11 million pages) that the FDIC seized in 2010 when SVB failed.  Until November 2016, defendants had understandably relied upon the government's January 2015 representation that the defendants had been provided with all of the materials seized by the FDIC–R when SVB failed.  The prosecutor now states in a December 23, 2016 declaration that he has learned that the January 2015 statement was incorrect.  While the Court makes no finding that the government has engaged in bad faith, the Court is quite concerned about the impact of the government's conduct on the ability of defendants to prepare for a March 20, 2017 trial.

The government argues that there is no prejudice associated with the delay in filing the superseding indictment because the defendants have not requested a continuance of the trial date in order to prepare a defense on the new charges.  The government argues that because the defendants have not requested a continuance, defendants cannot show prejudice *as a result* of the delay, as required by the case law.  *See Gregory*, 322 F.3d at 1162-65 (reversing district court's dismissal of superseding indictment on ground that the defendant's claimed prejudice flowed from fact that drug charges and money laundering charges were charged separately and prejudice was not specifically related to delay in filing superseding indictment).  In response to the government's argument, defendants assert that they have been placed in a "catch-22" situation where if they request a continuance of the trial date in order to prepare, the government will assert that they have waived their speedy trial rights, and if they do not request a continuance, the government asserts there is no prejudice.

The Court finds that defendants have been placed in an untenable position that is solely

United States District Court
Northern District of California

attributable to the government.  The government chose to file a superseding indictment that significantly expands the scope of this already complex case just a few months before trial.  The new charges in the superseding indictment are not the product of new information that has only recently come to light, but is based on information known to the government for years prior to the filing of the original indictment.  The government has produced millions of documents and its ESI production has been marked by technical problems that impair the ability of counsel to search these documents.  The government has discovered that its previous productions of material from the FDIC were not comprehensive as was represented, and the government has recently produced an additional amount of voluminous discovery (including materials such as Cutting's emails) and informed defense counsel of the existence of additional voluminous material seized by the FDIC from SVB in 2010. In light of all of the above, it is the Court's view that if this case were to proceed on the charges in the superseding indictment, the trial date would almost certainly need to be continued in order to allow the defense time to prepare.  The Court finds that considering all of the *Barker* factors under the particular circumstances of this case, the government's delay in filing the superseding indictment has violated defendants' rights to a speedy trial, and the Court DISMISSES the superseding indictment.  The government is directed to proceed to trial on the charges contained in the original indictment, and if the government wishes to refile the dismissed charges in a new action, the government may do so.[15]

## II.    Defendant Cutting's other motions regarding superseding indictment

Defendant Cutting has also filed the following motions with regard to the superseding indictment:  (1) motion to strike the omissions theory from Counts 1, 2, and 11 as insufficiently pleaded; (2) motion to strike surplusage from paragraph 19 and Counts 14-20; (3) motion to dismiss Counts 1 and 11 as time-barred; and (4) motion for disclosure of grand jury transcripts.  In light of the dismissal of the superseding indictment, the Court DENIES these motions as moot.  At

---

[15]  Cutting did not request a dismissal with prejudice, and the Court finds that a dismissal with prejudice is not warranted.  *See Gregory*, 322 F.3d at 1161 (noting that government could have chosen to file a new indictment rather than superseding indictment).

the hearing, counsel for Cutting acknowledged that the first three motions would be rendered moot by the dismissal of the superseding indictment, but argued that there was still a need for disclosure of grand jury transcripts because "there could be material in the colloquies that could be relevant to a motion to dismiss for prosecutorial misconduct . . . related to the 101 Houseco, if statements were made to the grand jury that were inconsistent with the evidence on 101 Houseco." Dkt. No. 334 at 5:11-13, 19-21.   The Court finds this assertion speculative as Cutting's motion for disclosure of grand jury transcripts did not relate to the 101 Houseco charges, but rather was focused entirely on the government's presentation of evidence to the grand jury regarding the Petaluma Greenbriar loans.   As the Court has dismissed the charges related to the Petaluma Greenbriar loans, the Court finds that the motion for disclosure of grand jury transcripts is moot.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant Cutting's motion to dismiss the superseding indictment.   The government shall proceed to trial on the charges contained in the original indictment, and the government may refile the dismissed charges in a new action.   The Court DENIES as moot the following motions filed by defendant Cutting: motion to strike the omissions theory from Counts 1, 2, and 11 as insufficiently pleaded; motion to strike surplusage from paragraph 19 and Counts 14-20; motion to dismiss Counts 1 and 11 as time-barred; and motion for disclosure of grand jury transcripts.

**IT IS SO ORDERED**.

Dated: January 6, 2017

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California