UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SEAN CUTTING, BRIAN MELLAND, and DAVID LONICH,<br><br>　　　　Defendants. | Case No. 14-cr-00139-SI-1<br><br>**ORDER RE: MOTIONS FOR DISCOVERY**<br><br>Re: Dkt Nos. 272, 276, 278, 291 |

On December 20, 2016, the Court held a hearing on the motions for disclosure and identification of exculpatory evidence filed by defendants Cutting and Lonich. Defendant Melland has joined in both motions, and Cutting and Lonich have joined in each other's motions. For the reasons set forth below, the motions are GRANTED in part and DENIED in part.

**BACKGROUND**

Discovery in this case has been voluminous, covers a time frame spanning over a decade, and encompasses materials collected from hundreds of different witnesses, state and federal government agencies, banks, and companies. Dkt. No. 271-1 ¶ 9 (Stephens Decl.). As of December 6, 2016, the government had produced over 3.3 million pages of documents to defendants. Dkt. No. 297 ¶¶ 5-6 (Rees Decl.).[1]

---

[1] In some of Cutting's papers, he states that the government has produced over 3.8 million documents (based on the Bates numbers of the documents). *See, e.g.*, Dkt. No. 271-1 ¶ 9 (Stephens Decl.). Thus, the record is unclear regarding how many documents the government has produced, perhaps in part because the government's production has been ongoing.

The government has also produced additional documents to defendant Lonich that have been the subject of ongoing litigation regarding whether those documents are privileged and outside the scope of the warrant. Those documents have not yet been produced to Cutting and Melland. The Court will issue a separate order on Lonich's further motion to suppress those

**I.    FDIC materials**

Much of the discovery produced by the government has consisted of materials obtained from the FDIC in its various capacities, including the FDIC as Receiver ("FDIC-R") and the FDIC Office of Inspector General ("FDIC-OIG").  On January 30, 2015, the government gave notice that it was "in possession of a forensically copied hard drive of materials taken by the FDIC the night Sonoma Valley Bank failed."  Dkt. No. 271-3, Ex. F.  The government's January 30, 2015 letter continued, "We believe that all of the materials have been produced to you.  However, the hard drive is available to you to review."  *Id*.  The parties agree that the FDIC-R is the entity that seized SVB's documents when the bank failed in August 2010.

At an October 28, 2016 status conference, the prosecutor informed the Court that the government was almost done producing discovery, and that the government had, on that day, produced three banker's boxes (approximately 3,000 pages) of discovery.  Dkt. No. 271-2, Ex. A at 6:20-22 (Oct. 28, 2016 hearing transcript).  The prosecutor also stated, "We have a little bit left to go, but it's in the order of less than five boxes, we believe, and we expect to be able to produce those in the next week or two."  *Id*. at 6:23-24.  The Court set a deadline of December 1, 2016 for the production of all exculpatory evidence and all evidence the government intended to use at trial, subject to a good cause exception for discovery produced after that date.  *Id*. at 13:5-16.

Although the government represented at the October 28, 2016 hearing that there were not more than 5 additional boxes of outstanding discovery, the same day the government gave defense counsel an "Investigations Inventory" that indicated it had another 23 boxes of hard copy documents, plus 15 disks containing electronic information "available for review."  Dkt. No. 271-1 ¶ 3, Ex. B.  The descriptions on the Investigations Inventory reflect that the FDIC obtained these documents when SVB closed in August 2010.  *Id*.

The October 28, 2016 Investigations Inventory sparked a series of letters and emails between the parties, with defense counsel seeking to clarify whether the 23 boxes and 15 disks had been previously produced (they had not).  Those exchanges led to further revelations by the

---

documents, and the disposition of that motion may result in further documents being produced to Cutting and Melland.

2

government, including that that there was even more voluminous material in the FDIC-R's possession that was seized when SVB failed in 2010 that had not and would not be produced to defendants (but defendants could subpoena that information if they wished). According to the government, that additional voluminous material, which the prosecutors overseeing this case do not possess and have not reviewed, is not relevant to this action.

In addition, counsel for Cutting states in his declaration:

> 4. On November 3, 2016, I sent Mr. Rees an email in response to his October 28, 2016 letter and Investigations Inventory to inquire, among other things, about the estimated page count of the documents that had yet to be produced. A true and correct copy of this November 3, 2016 email is attached as Exhibit C.
>
> 5. On November 10, 2016, I received a letter from Mr. Rees via email (dated November 9), that stated that the FDIC determined late last week that they had additional images of Sonoma Valley Bank employees Microsoft Outlook files. Mr. Rees provided a list of email storage files ("PST files") currently in the possession of the FDIC that had not been previously produced, and stated he would process only PST files highlighted in green (including two PST files belonging to Mr. Cutting). True and correct copies of the November 9, 2016 letter and all attachments are attached as Exhibit D.
>
> 6. Prior to the October 28 status conference and receiving Mr. Rees' November 9 letter, I sent Mr. Rees three emails asking specifically about emails of former SVB employee Alexis Tomsen. It appeared that the government had not produced any PST files for Ms. Tomsen prior to my inquiry which seemed at odds with the government's repeated assurances that they had provided open file discovery here. Ms. Tomsen worked in Credit Administration at SVB and played a central role in the approval of the 101 Houseco loans. A true and correct copy of my email correspondence on this issue is attached as Exhibit E.

Dkt. No. 271-1.

At a hearing on November 18, 2016, defense counsel informed the Court that the October 28, 2016 Investigations Inventory listed additional outstanding discovery beyond the 5 boxes that the government had represented at the October 28 hearing. In response, Mr. Rees stated, "I didn't know about that deadline [the December 1, 2016 deadline to produce exculpatory evidence and evidence to be used at trial] when I made the representations about the five additional boxes, so we, of course, went back and burned the barn down, and we are getting every discovery that we can possibly imagine that they could possibly need. We continue to do that." Dkt. No. 279, Ex. E at 13:11-18 (Nov. 18, 2016 transcript). Mr. Rees also stated that, "when you gave me that deadline, we – and I burned down the barn to find it, that's really the first time that I knew that

there was this whole separate entity out there [referring to the FDIC-R],[2] and so we immediately took steps to say hey, this is there. We will get you the things that we think could possibly have relevance, and the rest of it, go ahead and subpoena." *Id*. at 20:4-9. Mr. Rees stated,

> MR. REES: . . . We do have an FDIC/OIG agent on our case. The FDIC, to an extent, is on our trial team. We don't dispute that and we have been gathering documents from them. But recognized at the creation of the FDIC and recognized at least in other contexts in the Ninth Circuit, the FDIC-R, the FDIC as receiver, is a distinct entity of − created by the Government. What it does is when a bank fails, it goes and it has to, to my understanding − it has to just keep the bank going as it makes a transfer to another bank that is − takes over.
>
> In that capacity, they do two things. The first is that they have a team that goes in and tries to collect every possible document that could have any relevance to a civil lawsuit involving the failure of the bank. These are documents that in their widest imagination could have anything to do with some expected suit having to do with the failure of the bank.
>
> Now, that they have − that's the 23 boxes. We said if you would like to take a look at these boxes, I think we can make that available to you. Our subset is things that the FDIC, as the − in their investigative capacity thought had to do with this case. That's what we have turned over. Everything that we have been able to find of relevance to this. But we said there's a sort of expanded thing that the receiving institution, the FDIC-R collected. If you would like that, we can make that available. So, we now −
>
> THE COURT: That was true in 2014?
>
> MR. REES: That happened at the closure of the bank. This receiver comes in. They get those boxes −
>
> THE COURT: Right. And that − it went under in 2010; right?
>
> MR. REES: That's always been there.
>
> THE COURT: So it's always been there.
>
> MR. REES: It's not available to us. I could not get that material without a subpoena and a protective order. They just won't give it to me. The FDIC-R is separate. We have case law saying that we're a distinct entity −
>
> THE COURT: But if you asked me, I'd give you a subpoena.
>
> MR. REES: I did get a subpoena because they asked to get these 23 boxes.
>
> THE COURT: So you got it?

---

[2] The Court finds this representation puzzling at best, as the record clearly demonstrates that the prosecution has long been aware that the FDIC-R obtained SVB's documents when SVB failed in 2010.

4

> MR. REES: I just need one more signature on the protective order, and I will produce it by December 1st.
>
> Beyond that, the receiver does a massive data dump of the bank because that's what they have to do to keep it running. That's part of their records. I'm talking teller emails, every single depositor's bank records, all the money that's going through the bank, all the signature cards, just a massive data dump of the whole thing.
>
> I don't think that has any possibility of relevance in this case, and I can't access it anyway. But we have told them that that is out there, and if they would like to subpoena that, they are welcome to it.
>
> But that kind of data is very sensitive data, for one thing, because of the financial privacy issues involved. And I really don't think there is any chance that can be considered part of the prosecution team; otherwise, in any case, no matter how big or small, even a check kiting case, if the bank fails, suddenly the discovery obligation is to the multi-terabytes, and I just don't think that that can be the answer.
>
> But if they want it, they can have it. We are more than four months before trial. I have talked to the FDIC-R. They will respond to a subpoena. My subpoena was a trial subpoena so they didn't even have to give us the stuff four months in advance of trial. They did. They are willing to work. If somebody wants to look at all these teller records, they're going to need a distinct protective order because of the privacy issues. It's going to take work by them, but we said listen, if you want to leave no stone unturned, including looking through a teller's emails, you can do that. We want you to know that's out there. But in terms of our December 1st deadline, we don't have any interest in trying to comb through that material. We don't think it's relevant. We have no interest in introducing any of that material in our case in chief, and so anything that we thought could even possibly − that was a larger scope than what we had, we said we make it available, and we have once we get this last signature.
>
> That is really what is going on here. The discovery, yes, was bigger than the five boxes, but, again, we're trying to make sure, so we can keep our trial date, that we are getting them everything they could possibly need and more to make sure that everything is running shipshape.

*Id*. at 13:6-17:12. At the conclusion of the hearing, the Court entered the protective order and the government produced the 23 boxes to defendants, over defendant Lonich's objection.

In a letter dated November 9, 2016 to defense counsel, the government stated it has "no reason to believe" that the "additional materials" in the FDIC's custody are relevant to this case, and that these unproduced materials include "all data concerning the bank's financial reporting and customer accounts, including customer account details, loan information, deposits information, general ledger entries, loan origination information, accounts payable details, and customer signature cards, as well as daily, monthly, and other system reports generated on an account by account basis." Dkt. No. 271-1 ¶ 5, Ex. D (Stephens Decl.)

5

Assistant United States Attorney Robert Rees has filed several declarations addressing the government's production of discovery, and specifically discussing the production of material obtained from the FDIC. In a declaration filed on December 23, 2016,[3] Mr. Rees states:

> 3. With respect to the materials from the FDIC produced to the defendants on January 30, 2015, I am informed by Special Agent John Carrillo of the FDIC, Office of Inspector General, that he obtained the bulk of that material and it was freely provided to him by employees or contractors of the FDIC prior to May 2012. See Exhibit A (1/30/15 Discovery Letter). One exception was a set of documents referred to as "FDIC Reports of Examination, Visitation, and other records at Bates numbers SVB2032301 - SVB2032433." *Id*. Special Agent Carrillo reports that these materials were obtained from the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") pursuant to an Access Letter submitted to the FDIC on August 23, 2010. *See* Exhibit B (Access Letter).
>
> 4. On May 7, 2012, after Special Agent Carrillo obtained the material referred to above, the FDIC entered into a Memorandum of Understanding ("MOU") that established "procedures for communication and coordination among the Division of Resolutions and Receiverships (DRR), the Legal Division (LEGAL) and the Office of Inspector General (OIG) with respect to investigations of suspected criminal activity involving failed financial institutions." *See* Exhibit C (FDIC MOU). Among other things, the MOU provides that once an authorized investigation is referred to the Department of Justice ("DOJ"), "all requests for information will be initiated and followed through by DOJ." *See id*. Special Agent Carrillo understands this MOU to mean that due to the involvement of the DOJ in the above-captioned case, as of the date of the MOU, he was unable to personally access FDIC as Receiver ("FDIC-R") material without some form of process from the DOJ, such as a Grand Jury or trial subpoena.
>
> 5. On March 17, 2014, I caused the issuance of a Grand Jury subpoena to the FDIC-R for Sonoma Valley Bank. *See* Exhibit D (3/17/14 subpoena). The subpoena sought "any and all records related to Sonoma Valley Bank which was taken into receivership by the FDIC on August 20, 2010. The records shall include forensically captured records by FDIC contractor Deloitte to include the following: Drive #AFT-011824, HDD Images, Network and Email as follows: 1. Bruns_Kelly_Desktop_AFT-007944a; 2. Cutting_Sean_Desktop_AFT007938a; 3. Gorham_Kathy_Desktop_AFT-007933a; 4. Melland_Brian_Desktop_AFT-007943a; 5. Ordaz_ Veronica_Desktop_AFT-007923a; 6. Department_Shares; 7. Exchange_Email; 8. User_Shares."
>
> 6. According to Special Agent Carrillo, the Grand Jury subpoena issued on March 17, 2014, was requested in order to gain proper access to the FDIC material already in DOJ custody referred to in Paragraph 3 under the terms of the MOU discussed above in Paragraph 5. At Special Agent Carrillo's request, the FDIC did not produce any additional material to agents as a result of the subpoena issued on March 17, 2014. I had understood that the material already in the government's

---

[3] At the December 20, 2016 hearing, the Court asked the government to inform the Court and defense counsel about the manner in which the government had obtained material from the FDIC in this case. Mr. Rees filed the December 23, 2016 declaration in response.

possession included all documents seized by the FDIC-R when Sonoma Valley Bank failed.

7. On November 4, 2016, I caused the issuance of a trial subpoena to the FDIC for documents to be returned to the Court on March 20, 2017. *See* Exhibit E (11/4/16 trial subpoena). The subpoena sought "[a]ccess to all files seized by the FDIC from Sonoma Valley Bank upon its closure." I then spoke with an employee of the FDIC-R and learned that the material already in the government's possession was not a comprehensive copy of all the materials seized by the FDIC-R the day Sonoma Valley Bank failed. I learned there was a voluminous amount of material in the FDIC-R's possession that included depositor account records and other data that the government did not possess. I then orally limited the scope of the subpoena to include only a subset of potentially relevant employee emails, including those of defendants Cutting and Melland and bank employee Alexis Tomsen, and an electronic copy of documents contained in a number of boxes seized that Cutting sought access to through his attorney. *See* Exhibit F (11/3/16 Stephens Email (seeking "immediate access to these materials" and inquiring about "Alexis Tomsen's emails")). The FDIC-R indicated that they would voluntarily produce these materials as soon as they could prepare them, and would not wait until the March 20, 2017 trial date to produce them. The FDIC-R also indicated that they would do the same for the defense if served with a proper subpoena from them.

Dkt. No. 332 ¶¶ 3-7; *see also* Dkt. No. 297 (Dec. 6, 2016 Rees Decl.).

## II. Problems with the government's production of ESI

In support of the motion to dismiss, Cutting filed the declaration of Melanie White, the Senior Vice President of Discovery Solutions at Inventus, LLC. Dkt. No. 271-4. Inventus has been retained by Cutting's counsel to assist with the electronically-stored information ("ESI") produced by the government. As detailed in the declaration of Ms. White, the government's ESI "suffers from a number of technical issues which materially degrade [defense counsel's] ability to search and review that discovery." *Id*. ¶ 4. Those issues include: (1) documents with searchable text files that do not match the image of the document, such as when the searchable text for a file contains the text of an email and its attachment, but there is no corresponding image of the attachment; (2) emails that are missing attachments; (3) families of documents, such as an email and its attachments, produced as standalone documents without metadata indicating that they are part of a family; (4) emails and attachments produced as a single document, which makes it difficult when running a search to determine which individual document (the email versus the attachments) contains the search term; (5) failing to insert page breaks at the end of documents and producing multiple unrelated documents together as a single document (e.g., ten documents that

are two pages each produced as a single twenty-page document); and (6) multipage documents produced as single page "documents" (e.g., a four-page document produced as four separate one-page documents), thereby making it impossible to scroll through the entire document during review. *Id*. ¶¶ 5-17. Ms. White states that the magnitude and scope of these issues severely limit the ability of defense counsel to effectively search for, find and review documents within the ESI provided by the government, and that the scope of these problems cannot be ascertained without a manual review of all documents.

The government did not respond to any of Ms. White's specific statements regarding the problems with the government's ESI, except to state that the government has provided reformatted ESI to defendants upon request. Dkt. No. 297 ¶ 13. At the hearing on this matter, Cutting's counsel stated that these problems persist, while the government asserted that the problems have been corrected. However, the evidence before the Court consists of Ms. White's unrebutted declaration, and thus the Court accepts Ms. White's declaration as undisputed.

## DISCUSSION

Defendants request an order confirming that materials in the possession of the FDIC-R fall within the scope of the government's possession and must be included in the prosecutors' review of exculpatory and impeachment evidence. Defendants also request an order directing the prosecutors to specifically identify all exculpatory and impeachment information in the government's possession, including any exculpatory or impeachment evidence residing in the discovery provided to date. Finally, defendant Lonich requests that the Court order the government to produce its final witness list and exhibit list, with detailed witness summaries, on or before January 9, 2017, and to come into full compliance with Local Rule 16-1, on or before January 9, 2017.[4]

---

[4] The Court was unable to resolve the present motions prior to January 9, 2017 due to the briefing and hearing schedule as well as the need to resolve other motions filed by defendants.

## I.     FDIC-R as part of prosecution team

The parties dispute whether the FDIC-R is part of the prosecution team for purposes of searching for exculpatory and impeachment information, and thus whether the government has the obligation to obtain materials possessed by the FDIC-R, such as SVB employees' emails, and review those materials for *Brady*. Defense counsel for Cutting states that in anticipation of this issue, he sent an email on September 29, 2015 to the prosecutors asking them to confirm that because the FDIC participated in the criminal investigation, the FDIC (and other agencies) was "part of the prosecution team for purposes of searching for exculpatory information." Dkt. No. 271-1 ¶ 15, Ex. I (Stephens Decl.) (email titled "Disclosure of exculpatory information"). In an email dated October 16, 2015, Mr. Rees confirmed that the FDIC was inside the scope of their review for exculpatory evidence stating: "I agree that the federal agencies you cite, SIGTARP, the FDIC, FBI, FHFA, and IRS were part of our team at least in the larger overall investigation that led to these charges." *Id*.

Defendant also cites a January 4, 2010, memo by then-Deputy Attorney General David Ogden (the "Ogden Memo") providing guidance to all federal prosecutors regarding criminal discovery. Stephens Decl." ¶ 14, Ex. H. The Ogden Memo states it is the DOJ's policy that "[it] is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment evidence from all members of the prosecution team." *Id*. at 2. The memo states "in complex cases that involve parallel proceedings with regulatory agencies (SEC, FDIC, EPA, etc.), . . . the prosecutor should consider whether the relationship with the other agency is close enough to make it part of the prosecution team for discovery purposes." *Id*. Defendant notes that here, the FDIC filed civil litigation against Mr. Cutting and also initiated an administrative enforcement action against Mr. Cutting. Stephens Decl. ¶ 17; *see FDIC v. Switzer* et al., Case No. 13-cv-03834-RS (N.D. Cal.). In addition, FDIC agents participated in over one hundred witness interviews to date in DOJ's investigation, and DOJ attorneys were present for many of these interviews with the FDIC representatives. Stephens Decl. ¶ 16.

The government has no response to defendant's arguments about Mr. Rees' prior representation that the FDIC was part of the prosecution team. Instead, the government simply

asserts that the FDIC-R "is a separate entity within the FDIC that is not part of the 'prosecution team' for *Brady* purposes," Dkt. No. 293 at 6:10-11, and the government cites inapposite cases that address the rights of the FDIC-R versus the FDIC-C (Corporate) in civil litigation. *See Bullion Servs., Inc. v. Valley State Bank,* 50 F.3d 705, 709 (9th Cir. 1995) (holding the FDIC in its corporate capacity had the right to remove case to federal court independent of its removal rights in its capacity as receiver); *Fed. Deposit Ins. Corp. v. Bernstein*, 944 F.2d 101, 106 (2d Cir. 1991) ("[W]rongful conduct attributed to the FDIC as corporation cannot be attributed to the FDIC as receiver"); *Trigo v. Fed. Deposit Ins. Corp.*, 847 F.2d 1499, 1500 (11th Cir. 1988) (holding "federal law protects the FDIC in its corporate capacity from liability under contracts purchased from the FDIC as receiver of a failed bank's assets"); *In re F & T Contractors, Inc.*, 718 F.2d 171, 182 (6th Cir. 1983) (holding that where FDIC-R kept the assets and liabilities arising out of the letters of credit, FDIC-receiver was the proper party to sue, not FDIC-corporation).

The government also asserts that, "The record here makes clear that while the government may have knowledge of the material at the FDIC-R, it has no actual access to it other than by the same subpoena the defense could issue." Dkt. No. 293 at 6:16-18 (citing attached declaration of Raymond Rivard of FDIC-R; Mr. Rivard states FDIC-R will only provide documents pursuant to a subpoena). The government also states that it "has no detailed knowledge of the contents of the material" seized by the FDIC-R. *Id*. at 4:28–5:2.

Defendant's reply challenges both of these assertions as false. Defendant argues that the government knows the content in the material seized by the FDIC-R, and asserts that the government has been reviewing some of that material for over five years. Defendant cites an email dated October 27, 2011, from the Deputy Chief Counsel for SIGTARP to AUSA Reeves confirming that the FDIC-R had provided SIGTARP with emails of SVB employees and that SIGTARP agents were preparing to review those emails. Dkt. No. 336 ¶ 6 (Stephens Reply Decl.). Defendant argues that "This email alone proves that, in 2011, the prosecutors and their agents began reviewing emails of SVB employees that the FDIC-R provided to them. So it is simply not accurate for the government to claim [at the November 18, 2016 status conference] that they have just recently "burned down the barn" and learned "there was this whole separate [FDIC-

R] entity out there." Dkt. No. 315 at 2:8-12 (quoting transcript of Nov. 18, 2016 status conference at 20:5-7, Dkt. No. 315, Ex. E).

The Court concludes that under the circumstances of this case, the FDIC-R is part of the prosecution team. The government does not dispute that the FDIC-R participated in the investigation of this case. *See United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989) ("The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant."); *see also* Dkt. No. 336 ¶¶ 6, 8 (discussing evidence showing the FDIC-R's participation in investigation) (Stephens Reply Decl.). Further, the record before the Court shows that during the course of the government's investigation and prosecution of this case, the prosecution received materials from the FDIC-R both through voluntary production and by subpoena. The Court also finds it highly significant that the prosecutor previously represented that the "FDIC" was part of the prosecution team, without drawing any of the distinctions that the government now asserts.

### III.   *Brady/Giglio* disclosure

#### A.   Documents already produced by the government

Defendants request that the Court order the government to specifically identify all exculpatory and impeachment material in its possession, including the Bates numbers of any documents previously produced. Defendant Cutting argues that this relief is warranted because (1) "the government has produced millions of pages of discovery to date and did so in a format that is exceptionally difficult to review"; (2) "the government misrepresented the scope of the outstanding discovery and is [producing] another mountain of discovery that is so large that they cannot provide any estimate regarding the page count of the new material"; and "[t]he government also misrepresented its approach to producing *Brady* material. The government assured the Court that it produces *Brady* every time they come across it, but the reality is that the government sat on this new material, which includes some of Mr. Cutting's email files, for years." Dkt. No. 272 at 3:2-10.

The government responds that it has satisfied its obligations under *Brady* by providing

11

defendants with "open file" discovery, and that the government need not and could not identify what defendants might deem exculpatory. The government argues,

> There are innumerable ways the defendant may choose to defend this case at trial, from outright denial to a simple failure of the burden of proof, and the government has no way of knowing which one or more of such defense tactics the defendant may ultimately believe is worth pursuing. Moreover, even if the defendant offered to disclose in detail the trial tactics he intends to pursue in this case, which he has not, nothing would prevent him turning around after trial or on appeal and claiming another tactic would have been even better if only the government had singled out another document that was ostensibly "exculpatory" as to that other, new tactic.
>
> Even if these problems could be solved, a more fundamental problem remains. As numerous *Brady* cases make clear, defendants, prosecutors, and courts often seriously disagree about what constitutes "exculpatory" information, even when there is no dispute as to the content of that information.

Dkt. No. 293 at 8:15-25.

Typically, the government has no obligation to "single out" particular pieces of exculpatory evidence. *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (en banc) ("Rhoades points to no authority requiring the prosecution to single out a particular segment of a videotape, and we decline to impose one."). However, as defendants note, courts have also recognized that there may be circumstances where the "duty to disclose [exculpatory evidence] may be unfulfilled by disclosing too much; at some point, 'disclosure,' in order to be meaningful, requires 'identification' as well." *United States v. Salyer*, 271 F.R.D. 148, 155 (E.D. Cal. 2010), *opinion adhered to on reconsideration*, *United States v. Salyer*, No. S-10-0061 LKK (GGH), 2010 WL 3036444 (Aug. 2, 2010)[5]; *see also United States vs. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998), *reversed in part on other grounds*, 176 F.3d 517 (D.C. Cir. 1999) ("The government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack"); *United States v. Blankenship*, No. 14-cr-00244, 2015 WL 3687864, at *7 (S.D. W.Va. June 12,

---

[5] The government contends that "[t]he *Salyer* district court case . . . preceded *Rhoades* and thus is no longer good law." Dkt. No. 293 at 9:13-14. However, *Salyer* addressed *Rhoades*, describing it as "a correct legal argument in the circumstances of that case, but inapposite." *Salyer*, 2010 WL 3036444, at *2. The Ninth Circuit filed its original opinion in *Rhoades* on March 8, 2010 and an amended opinion on February 8, 2011, with the *Salyer* opinions issued in July and August of 2010. On reconsideration, the *Salyer* court affirmed its previous order and modified the logistics of implementing the prior order. Both *Rhoades* opinions contain the same analysis on the issue of "singl[ing] out" pieces of evidence, and thus *Rhoades* did not overrule *Salyer*.

2015) (requiring the government to identify *Brady* material and holding "the United States does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery" and "the United States, having determined the nature of the charges and having knowledge of the evidence and witnesses it intends to produce to prove those charges, is in a far better position than the Defendant to know what evidence might be exculpatory and/or impeachment material under *Brady*").

The Court finds that after careful evaluation of the circumstances of this case, it is appropriate to require the government to identify the *Brady* material in the discovery that has been produced. The Court finds *Salyer* instructive. In that case, "[o]ver the course of approximately five years before indictment, the government collected, i.e., subpoenaed, acquired through warrant, or other means, a massive amount of documentary information. Not only does the electronic information consist of multiple gigabytes, pages numbering into the millions, the hard paper information fills more than two "pods" (storage containers), and there is further documentation stored in F.B.I. offices." 2010 WL 3036444, at *3. The government represented that "every document acquired or seized by the government has been made available to the defense." *Id*. The government argued that, "it should not have to 'crawl in to the mind of defense counsel' to prepare the defense in this case by identifying *Brady/Giglio* information, and in any event, that the burden of doing so in this case would impose an impossible requirement." *Id*. The court rejected those arguments:

> First, upon close inspection, the government's argument is not supported in the "big documents" case. As pointed out by Salyer in referencing the DOJ *Brady/Giglio* guidelines, and as well established by case law, the prosecution has the duty to affirmatively scour those records of the agencies considered the "government" for purposes of the criminal case in order to determine and acquire those materials which would be considered *Brady* exculpatory and *Giglio* impeaching. Indeed, the most recent Department of Justice guidelines, fashioned after some embarrassing non-disclosures in other cases, command an actual review of the materials acquired during investigation of a criminal case for the purpose of disclosing *Brady/Giglio* materials. Tellingly, nowhere in the memorandum does it even suggest that in lieu of affirmatively looking for *Brady/Giglio* the prosecutor may determine not to look at all and simply disclose the entire discovery file. . . .
>
> . . . During the course of any large case investigation, investigators and attorneys are going to have to review and organize the sometimes immense amount of evidence that is acquired. During the course of the years long investigation in this case, the government personnel seemed to be able to segregate that evidence

13

> which would be useful in the prosecution in terms of guilt, but apparently made no efforts to segregate that evidence which runs counter to the charges. Assuming for the moment that some *Brady/Giglio* evidence, as the court has defined it below, exists, the reviewing personnel apparently made no note of the evidence, or merely having noted it, "stuck it back" in the ever-increasing pile to be an inevitably hidden part of the mass disclosure. The obligations imposed by *Brady et al.* have been well established for years, and should be anticipated in every case during the investigation phase. If the government argues that it is now "impossible" to comply with the burden of reviewing evidence for identification purposes, the government more or less made its own bed in this matter by making it impossible.
>
> . . .
>
> The government's argument at hearing on the burden of requiring *Brady/Giglio* identification in the voluminous documents case actually is the argument which conclusively proves Salyer's point in this case. . . . If the government professes this inability to identify the required information after five years of pre-indictment investigation, its argument that the defense can "easily" identify the materials buried within the mass of documents within months of post-indictment activity is meritless. Obviously, under the government's reasoning, the defense burden is even more impossible. What the government is actually arguing, in effect and for practical purposes, is—that logistics in the "big documents" case render *Brady/Giglio* a dead letter no matter who has the burden of ascertaining the information. There is no authority to support this evisceration of constitutional rights just because the case has voluminous documentation.

*Id*. at *3-5 (internal citations omitted); *see also Blankenship*, 2015 WL 3687864, at *6-7.

The Court agrees with the *Salyer* court's analysis and finds it applicable here. In this case, the government's production has not only been voluminous, but its electronic production has been marred by technical problems that seriously impede defendants' ability to search the ESI. Although the government represented in January 2015 that it had produced to defendants all of the material seized by the FDIC when SVB failed in August 2010, that representation was not in fact correct. Further, the government has recently produced, in response to a trial subpoena, an additional 23 boxes of material, including defendant Cutting's emails as well as emails of other SVB employees who were involved in the loan transactions at issue. Under all of these circumstances, the Court finds it appropriate to order the government to identify by Bates number the *Brady/Giglio* material in the discovery that has been produced.

### B. Documents at FDIC-R that have not been produced

With regard to the approximately 11 million documents in the possession of the FDIC-R, the government has represented to this Court and to defendants that this material is irrelevant to

14

this case because it consists of teller emails, depositors' bank records, customer signature cards, loan origination information and other types of documents. The prosecutors have also informed the Court that they have not reviewed this material. Mr. Rees stated in his December 23, 2016 declaration,

> 7. On November 4, 2016, I caused the issuance of a trial subpoena to the FDIC for documents to be returned to the Court on March 20, 2017. *See* Exhibit E (11/4/16 trial subpoena). The subpoena sought "[a]ccess to all files seized by the FDIC from Sonoma Valley Bank upon its closure." I then spoke with an employee of the FDIC-R and learned that the material already in the government's possession was not a comprehensive copy of all the materials seized by the FDIC-R the day Sonoma Valley Bank failed. I learned there was a voluminous amount of material in the FDIC-R's possession that included depositor account records and other data that the government did not possess. I then orally limited the scope of the subpoena to include only a subset of potentially relevant employee emails, including those of defendants Cutting and Melland and bank employee Alexis Tomsen, and an electronic copy of documents contained in a number of boxes seized that Cutting sought access to through his attorney. *See* Exhibit F (11/3/16 Stephens Email (seeking "immediate access to these materials" and inquiring about "Alexis Tomsen's emails")). The FDIC-R indicated that they would voluntarily produce these materials as soon as they could prepare them, and would not wait until the March 20, 2017 trial date to produce them. The FDIC-R also indicated that they would do the same for the defense if served with a proper subpoena from them.

Dkt. No. 332 ¶ 7.

The Court finds that the present record is unclear regarding how the prosecution determined that the unproduced additional voluminous materials possessed by the FDIC-R do not contain any information relevant to this case, particularly if, as it appears, the "subset of potentially relevant employee emails" as well as the "boxes seized that Cutting sought access to" came from the documents in possession of the FDIC-R and were produced in response to the trial subpoena.[6] Further, although the prosecutors state that they have not reviewed this material, presumably someone has, otherwise it is not clear how the prosecution would be able to determine that this material is irrelevant. The Court directs the government to file within 14 days of this order a declaration (or declarations) stating, with specificity, how the prosecution has determined that the voluminous material in the possession of the FDIC-R, which the prosecution does not

---

[6] As defendant Lonich notes, materials requested pursuant to a trial subpoena must meet Rule 17(c)'s requirement of relevance. *See generally United States v. Nixon*, 418 U.S. 683, 699-700 (1974); Crim. R. Proc. 17(c); Crim. L.R. 17-2.

have and does not want, does not contain any material relevant to this case.

### III.  Defendant Lonich's additional requests

Defendant Lonich also requests an order directing the government to comply with Local Rule 16-1, and he also seeks a January 9, 2017 deadline for final witness and exhibit lists.  The government states that defendant's request for potential Rule 404(b) evidence and co-conspirator statements "has been met, and will continue to be met to the extent further evidence is developed, by the provision to the defense of witness interview reports and other discovery." Dkt. No. 295 at 8 n.1.

Defendant argues that the government's assertion that it has complied with Local Rule 16-1 is incorrect.  That rule provides,

> (c) **Supplemental Disclosure**.  In addition to the information required by Fed. R. Crim. P. 16, in order to expedite the trial of the case, in accordance with a schedule established by the parties at the conference held pursuant to Crim. L.R. 16-1(a) or by the assigned Judge pursuant to Crim. L.R. 16-1(b), the government shall disclose the following:
>
> . . .
>
> (3) **Evidence of Other Crimes, Wrongs or Acts**.  A summary of any evidence of other crimes, wrongs or acts which the government intends to offer under F. R. Evid. 404(b), and which is supported by documentary evidence or witness statements in sufficient detail that the Court may rule on the admissibility of the proffered evidence; and
>
> (4) **Co-conspirator's Statements**.  A summary of any statement the government intends to offer under F. R. Evid. 801(d)(2)(E) in sufficient detail that the Court may rule on the admissibility of the statement.

Crim. L.R. 16-1(c).  Defendant states that the government has not provided summaries of Rule 404(b) evidence or alleged co-conspirator statements as required by the rule.[7]

Based upon the record before the Court, it appears that the government has not fully complied with Local Rule 16-1.  The Court directs the government to provide summaries of Rule 404(b) evidence and co-conspirator statements by January 26, 2017.  Defendant Lonich also

---

[7] Counsel for Lonich states that on the day that the government filed its opposition, counsel wrote to the prosecutors asking where the summaries were located, and that as of December 13, 2016, the prosecutors had not responded.  Dkt. No. 319 ¶ 2, Ex. O (Balogh Reply Decl.).

16

requested a deadline of January 9, 2017 for the government to produce its witness and exhibit lists. Lonich's request was largely predicated on the fact that the superseding indictment significantly expanded the scope of this case. In light of the fact that the Court has dismissed the superseding indictment, the Court finds that Lonich has not demonstrated a need to deviate from the prior schedule set by the Court. *See* Dkt. No. 223.

### CONCLUSION

Within 14 days of this date of this order, the government shall file a declaration (or declarations) stating, with specificity, how the prosecution has determined that the voluminous material in the possession of the FDIC-R, which the prosecution does not have and does not want, does not contain any material relevant to this case.

Within 21 days of the date of this order, the government shall identify to defense counsel all exculpatory and impeachment materials previously produced to defendants. Any documents identified pursuant to this order shall be identified by Bates number to defense counsel. This requirement to identify *Brady/Giglio* material by Bates number also applies to any discovery that the government has not yet produced.

The government shall provide summaries of Rule 404(b) evidence and co-conspirator statements by January 26, 2017.

**IT IS SO ORDERED**.

Dated: January 12, 2017

SUSAN ILLSTON
United States District Judge