1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                       NORTHERN DISTRICT OF CALIFORNIA

8

9   UNITED STATES OF AMERICA,                Case No. 14-cr-00139-SI-1

             Plaintiff,

10

11          v.                               **ORDER RE: FURTHER MOTION TO SUPPRESS**

12   SEAN CUTTING, BRIAN MELLAND, and        Re: Dkt. No. 280
     DAVID LONICH,

13          Defendants.

14

15          On December 20, 2016, the Court held a hearing on defendant Lonich's motion to

16   suppress.  After consideration of the parties' arguments and the record, the Court enters this order.

17

18                                  **BACKGROUND**

19          On March 18, 2014, the government filed a twenty-nine count indictment against

20   defendants David Lonich, Brian Melland, and Sean Cutting.[1]  Lonich is charged with conspiracy

21   to commit wire and bank fraud in violation of 18 U.S.C. § 1349 (Count One), bank fraud in

22   violation of 18 U.S.C. § 1344 (Count Two), wire fraud in violation of 18 U.S.C. § 1343 (Counts

23   Three through Eight), conspiracy to make false statements to a bank in violation of 18 U.S.C.

24   § 371 (Count Nine), conspiracy to commit money laundering in violation of 18 U.S.C. §1956(h)

25

26          ────────────────

27          [1]   Bijan Madjlessi was originally charged in the indictment with the other defendants.
     Madjlessi died after the indictment and by operation of law all charges against him were
     dismissed.  In an order filed January 6, 2017, the Court dismissed the superseding indictment, and
28   accordingly this order cites the original indictment.

United States District Court
Northern District of California

United States District Court
Northern District of California

(Count Ten), money laundering in violation of 18 U.S.C. § 1957 (Counts Eleven through Twenty-Two), making false bank entries in violation of 18 U.S.C. § 1005 (Counts Twenty-Four through Twenty-Eight), and attempted obstruction of justice in violation of 18 U.S.C. § 1512 (Count Twenty-Nine).  Madjlessi was a real estate developer, Lonich was Madjlessi's attorney, Cutting was President and CEO of Sonoma Valley Bank until it failed in or about August 2010, and Melland was the Senior Vice President and Chief Loan Officer of Sonoma Valley Bank until March 2010.

The indictment alleges: "No later than approximately March 2009 until approximately September 2012, the defendants devised and executed a material scheme to defraud Sonoma Valley Bank and others and to obtain money from Sonoma Valley Bank and others by means of materially false and fraudulent pretenses, representations, and promises and by omissions and concealment of material facts."  Dkt. No. 1 ¶ 7.

In April 2014, Special Agent Terry M. Neeley of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") submitted a search warrant application to Chief Magistrate Judge Joseph C. Spero.  Dkt. No. 190-5 (Neeley Decl. ¶ 2).  Neeley's twenty-nine page affidavit, which was provided in support of and incorporated into the search warrant application, described the nature of the investigation and the bases for probable cause.  *See* Dkt. No. 326-1 (Warrant Affidavit). The affidavit provided:

> I am currently investigating real estate developers identified as Bijan MADJLESSI and David LONICH, and several of their associates, including COOPERATING SOURCE ("CS"), a construction contractor, Brian MELLAND, a banker, Sean CUTTING, a banker, and others. The targets of my investigation are suspected of fraudulently obtaining millions of dollars of loans from the now-defunct Sonoma Valley Bank ("SVB"), previously located in Sonoma, California. . . . The targets are further suspected of using SVB loan proceeds to fraudulently purchase from the FDIC a note relating to a portion of the Park Lane Villas ("PLV"), a multi-purpose residential and commercial development located in Santa Rosa, California. The scheme included seeking to obtain permanent financing from the Federal Home Loan Mortgage Corporation ("Freddie Mac") or the Federal National Mortgage Association ("Fannie Mae").
>
> I submit this affidavit in support of an application for a warrant to search for certain items particularly described in Attachment B, attached hereto and incorporated by reference, which may be present at the offices and residences of MADJLESSI and LONICH, more fully described in Attachment A . . . . There is probable cause to believe that documents related to MADJLESSI's and LONICH's purchase, ownership, and control of PLV are presently located at the subject premises. In

addition, as requested below in Section XIII, this affidavit also seeks authorization to search computers, cell phones, and other electronic or digital devices (collectively, "digital devices") located in the subject premises for items described in Attachment B, following the procedures set forth herein and further described in Attachment C, attached hereto and incorporated by reference.

*Id*. ¶¶ 3-4.

Attachment B "ITEMS TO BE SEIZED" of the affidavit to the warrant application identified the following items for seizure:

A. Evidence of violations of Title 18, United States Code, Sections 371 and 1349 (Conspiracy and Conspiracy to Commit Bank Fraud), Section 1344 (Bank Fraud), Section 656 (Misapplication of Bank Funds), Section 1005 (False Entries), Section 1512(c) (Attempted Obstruction of Justice –Tampering with a witness), Section 1343 (Wire Fraud), Section 1956(h) (Money Laundering Conspiracy) and Section 1957 (Money Laundering Transactions using Specified Unlawful Activity Proceeds), involving any scheme relating to a purchase by 101 Houseco, LLC of an IndyMac loan defaulted on by Bijan MADJLESSI associated with the Park Lane Villas ("PLV"), using funds obtained from Sonoma Valley Bank, any and all efforts to construct, remodel, or purchase any aspect of PLV, including the use of any Sonoma Valley Bank funds or documents, and any and all efforts to obtain funding, financing, or refinancing for any PLV-related activity, including from Terra Capital Partners and Freddie Mac. Such evidence, in physical or electronic form, includes all documents, business records, photographs, audio or video recordings, communications, and any evidence of the ownership, custody, control of, and association with, any of the following:

1. Sonoma Valley Bank, including information on any legal lending limits to Bijan MADJLESSI or any entity or person associated with him;

2. Sonoma Valley Bank employees, including Sean Cutting, Brian Melland, Veronica Ordaz, John Barr, Cathleen Gorham, Alexis Thompson, Genevieve Lota, Suzanne Brangham, and Kelly Bruns;

3. Business entities associated with Bijan MADJLESSI and David LONICH, including 132 Village Square, LLC, 114 Park Lane Santa Rosa, LLC, Masma Construction, Greenbriar Construction, and Menlo Oaks Corporation;

4. 101 Houseco, LLC and any related entities, including the House Family Investment Trust, the Houseco Investment Trust, the Sterling Residence Trust, 103 Star, LLC, Ananda Partners 1 LLC, Ananda Advisors, Annadel Capital, Inc., and 101 Park Lane, LLC;

5. Terra Capital Partners, and any of its employees or associates, including Adam Kies, Dan Cooperman, and David Packer; 6. The Debt Exchange ("DebtX") and any of its employees or associates, including Kenneth Daley and Kevin Kelley;

7. The Federal Deposit Insurance Corporation ("FDIC") and any of its employees or associates;

8. CBRE and any of its employees or associates;

9. The formation and control of any companies incorporated or to be incorporated in Panama; and

3

10. The following individuals:

• Patricia Brajkovich

• Martel Jed Cooper

• Farhad Hariri

• Derrek Horn

• Phillip Horn

• James House

• Kristina House

• Pamela Hubbard

• Jennifer Irvine

• Elizabeth Madjlessi

• Michael Madjlessi

• Cornelius Oosterbaan

• Eric Reed

• Michael Greg Smith

• Terry Strongin

• William Kelly Vandever

• Michael Zalkaske

• John Carrillo

• Terry Neeley

• Jim Thiede

B. Evidence of the custody, occupancy, ownership, or control of PLV and any money generated by or associated with it by any party, and any subpart of PLV such as residential or commercial units of PLV, including agreements or documents associated with the purchase, sale, lease-back of apartments, condominiums, or office space located within PLV or associated with PLV or any related loans, and any records relating to any funds generated by or associated with PLV and the disposition of any such funds.

C. Evidence of any association between and contact among Bijan MADJLESSI, David LONICH, Sean CUTTING, and Brian MELLAND including photographs depicting them or any subset of two or more of them, their presence in any one of their contact lists, whether electronic or otherwise, or communication between them of any variety.

United States District Court
Northern District of California

D. Evidence of custody, occupancy, ownership, or control of any of the locations searched pursuant to this warrant, including documents relating to the rental or ownership of the locations, mail addresses to the locations, identification documents found therein, and any other relevant indicia.

*Id.*

Neeley's affidavit also stated,

Attachment B specifies a number of names and entities that have been identified as having specific relevance to the investigation leading to this warrant. This was done in an effort to provide additional guidance during the execution of the search warrant given the potential privilege issues identified above. The individuals and entities named have come up in a variety of contexts, some as witnesses, some as potentially involved in the scheme described herein, and some as potential victims. Some of the entities and individuals have previously been identified by name in this affidavit, others have been identified by moniker of some sort such as "AVL Subject B," and others have not been previously discussed. In an effort not to unnecessarily reveal all aspects of the investigation or otherwise prejudice any party, some of the individuals are listed below without description of their potential role.

1. Relevant Sonoma Valley Bank former employees include Sean Cutting, Brian Melland, Veronica Ordaz, John Barr, Cathleen Gorham, Alexis Thompson, Genevieve Lota, Suzanne Brangham, and Kelly Bruns;

2. Relevant business entities associated with Bijan MADJLESSI and David LONICH include 132 Village Square, LLC, 114 Park Lane Santa Rosa, LLC, Masma Construction, Greenbriar Construction, and Menlo Oaks Corporation;

3. Relevant entities related to 101 Houseco, LLC include the House Family Investment Trust, the Houseco Investment Trust, the Sterling Residence Trust, 103 Star, LLC, Ananda Partners 1 LLC, Ananda Advisors, Annadel Capital, Inc., and 101 Park Lane, LLC;

4. Relevant Terra Capital Partners employees and associates include Adam Kies, Dan Cooperman, and David Packer;

5. Relevant DebtX employees and associates include Kenneth Daley and Kevin Kelley;

6. CBRE was an entity that assisted Freddie Mac with the refinance obtained by MADJLESSI and LONICH in September 2012 as discussed above;

7. The following individuals were relevant to this investigation either as witnesses, potential victims, or as tangibly involved in the scheme described herein:

• Patricia Brajkovich

• Martel Jed Cooper

• Farhad Hariri

• Derrek Horn

• Phillip Horn

5

• James House

• Kristina House

• Pamela Hubbard

• Jennifer Irvine

• Elizabeth Madjlessi

• Michael Madjlessi

• Cornelius Oosterbaan

• Eric Reed

• Michael Greg Smith

• Terry Strongin

• William Kelly Vandever

• Michael Zalkaske

8. The following federal government Special Agents participated in this investigation and interview numerous individuals associated with MADJLESSI, LONICH, CUTTING, and MELLAND, including the CS.

• John Carrillo

• Terry Neeley

• Jim Thiede

*Id*. ¶ 95.

Attachment C to the warrant required the Government to purge from its possession all

electronic files that fell outside the scope of the warrant's authorized seizures, as follows:

> Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

*Id*. at USA 3172.

Because Lonich is an attorney, the search warrant and affidavit set forth a process by

which the government formed a "privilege team"[2] to review the seized materials.  *Id*. ¶ 94.  The

affidavit stated, "[o]ut of an abundance of caution, and given the nature of the requested search

---

[2]  The parties have also referred to the "privilege team" as the "taint team."

which includes the offices and residence of an attorney, all materials seized at the time of the search shall be treated as potentially privileged material and a Privilege Team shall be employed." *Id.*

On April 7, 2014, Judge Spero approved the search warrant application. Dkt. No. 191-5 (Neeley Decl. ¶ 2). The warrant authorized the search of Lonich's residence, Madjlessi's residence, and the three business units located at Park Lane Villas ("PLV"), 960 Doubles Drive, Unit Nos. 112, 113, and 114. Dkt. No. 187, Ex. A.  In a declaration filed on November 23, 2016, Lonich states,

> 1.  . . . I make this declaration regarding the issue of standing regarding the April 2014 searches of the office suite commonly known as 960 Doubles Drive, No. 112, Santa Rosa, CA and the office commonly known as 960 Doubles Drive, No. 113, Santa Rosa, CA.  I respectfully contend that, at a minimum, I have standing to challenge the seizures from certain identified areas in Unit 112. For the Court's convenience, I attached hereto as Exhibit A a modified copy of the floor plan Special Agent Neeley included in Attachment A to the search warrant application.[3] I have identified the particular offices and areas to match the naming convention I have been informed and believe was adopted by the search agents, *i.e.*, Area 1A, Area 1B, etc. through Area 1M.  As set forth therein, Area 1A is the entry area within Unit 112. I describe the individual areas more fully *infra* at Paragraphs 5 through 11.
>
> 2.  Beginning January 1, 2009, I was retained as general counsel for Bijan Madjlessi, as well as entities that he controlled and all entities that Biganeh Madjlessi, Bijan Madjlessi's spouse, controlled.  In that capacity, it was my responsibility to maintain and preserve documents regarding, referring and/or relating to my clients.  At the onset of my retention, Bijan and Biganeh and the employees of the entities they controlled maintained their offices at 1600 Los Gamos Drive, Suite 345, San Rafael, California. I was given my own office. Files that I was charged with maintaining and preserving were maintained in various locations within the offices.
>
> 3.  Commencing in January 2009, and continuing throughout the entire time that I was general counsel, Patricia Brajkovich, an employee of one of Bijan's companies, acted as my paralegal.
>
> 4.  In or about June 2011, Bijan relocated his office to a portion of Park Lane Villas East, which was shown on the final subdivision map for Park Lane Villas East as comprising three (3) condominiums and given the addresses of 960 Doubles Dr., Unit 112, Unit 113 and Unit 114.  The space contained within these three (3)

---

[3]  The floor plan included in Attachment A to the search warrant application showed Units 112, 113, and 114, and was not further subdivided into specific offices or areas.  *See* Dkt. No. 187, Ex. A (search warrant with attachments).

condominium units was improved into various offices and common areas that I have described as Unit 112 and the office I have described as Unit 113.[4]

5.  From June 2011 to approximately February 2012, the following employees of Bijan and/or his controlled companies used separate offices in Unit 112 as follows:

Stephanie Burman, who provided accounting and bookkeeping services in what I am informed and believe has been identified by the United States as Area "IB";

Patricia Brajkovich, who provided paralegal services for me and general administrative services in what I am informed and believe has been identified by the United States as Area "1E"; and

Juanita Vyfhuis, who provided general administrative services in what is identified by the United States as Area "1i."

6.  Bijan maintained an office in what I am informed and believe has been identified by the United States as Area "1K."  I was provided with an office which I am informed and believe has been identified by the United States as Area "1J."

7.  During that same period of time, there was a conference room which I am informed and believe the United States has identified as "1F" was [sic] the conference room.  Commencing on or about September 2012, the conference room became the rental office used by 101 Houseco and was from that time on occupied by Jennifer Irvine, the on-site property manager for 101 Houseco.[5]

8.  Directly adjacent to Burman's office was the copy and storage room, where a copy machine, a postage machine and office supplies were maintained.  Directly adjacent to the copy and storage room was the kitchen.  Next to the kitchen was the office used by Brajkovich, *viz.*, Area "IE."  Next to the Brajkovich office was an empty office used for storage of files (what the Government misidentified as Klavydia's office, *viz.*, Area "1G."  Next to that storage office was the office previously used by Juanita Vyfhuis, *viz.*, Area "1i."  When Vyfhuis left her employment in February 2012, that office also became used for storage of files.  My office was next to Area "1i" and as noted above is listed as Area "IJ."

9.  A hallway was directly outside the doors of Areas 1D-1J.  That area – which was directly across from my office – contained seven file cabinets where I maintained my client files.  I am informed and believe that the Government has identified this area as "1M."  At the end of that hallway was the office used by Biganeh, *viz.*, what I am informed and believe the Government has identified as

---

[4]  According to the diagram attached to Mr. Lonich's declaration, it appears that Unit 114 contained Bijan Madjlessi's personal office (denoted as "1H" on diagram).  The Court notes, however, that although the drawing identifies "1H" as Bijan Madjlessi's office, Mr. Lonich states in his declaration that Bijan Madjlessi's office was "1K."  *Compare* Dkt. No. 282 ¶ 6, *with id.* at Ex. A. However, Mr. Lonich also states that Biganeh Madjlessi's office was in the space identified as "1K," and the floorplan attached to Mr. Lonich's declaration also identifies "1K" as Biganeh Madjlessi's office.  *See id.* at ¶ 9 and Ex. A.  In any event, as discussed *infra*, the Court finds that Lonich does not have standing to challenge the searches of the private offices of either Bijan or Biganeh Madjlessi, and thus for purposes of this order the precise location of the offices of Bijan and Biganeh Madjlessi is irrelevant.

[5]  Based upon the floorplan attached to Lonich's declaration, it appears that "1F" was in Unit 113.

8

Area "1K."  Adjacent to that office was the electrical room for the entire space; I am informed and believe that the Government has identified that room as Area "1L."

10.  All of the areas I have described are accurately labeled on the floor plan presented as Exhibit A to this declaration.

11.  During the period from June 2011 to the date of the search, I maintained and preserved my client files in (a) the office that I occupied (1J); (b) the storage office that was never occupied by any employee of the Madjlessi's (1G); (c) the storage office that was, until February 2012, used by Ms. Vyfhuis (1i); (d) the office used by Ms. Brajkovich, my paralegal (1E); and (e) in seven (7) file cabinets located in the hallway (1M).  I contend that I maintain standing regarding the seizure of my files from these locations, i.e, Rooms 1J, 1E, 1G, 1i, and 1M.

12.  With respect to my paralegal, the Court should note that the materials maintained in her office files for (a) each of the then pending lawsuits in which I was the attorney of record or was otherwise representing my clients; and (b) each entity for which I was responsible for maintaining and preserving the books and records.

Dkt. No. 282 ¶¶ 1-12.

On April 9, 2014, the government executed the search warrant and seized materials from the two residences and the three units at 960 Doubles Drive. Defendant states, and the government does not dispute, that agents seized and carted away for later inspection all electronic files and 143 boxes of paper documents that defendant maintained in his home and office.  Dkt. No. 186 at 1; Dkt. No. 237 at 2.

On March 4, 2016, defendant Lonich moved to suppress evidence obtained as a result of the execution of a search warrant. Dkt. No. 186.[6] Lonich argued that the government crafted an overbroad warrant permitting the seizure  of "all documents" that related to any of the people or entities listed in Attachment B, regardless of any connection or lack thereof to the financing or development of PLV East by 101 Houseco.  Lonich argued that the warrant broadly and

_____

[6]  The government refers to the March 4, 2016 motion as Lonich's second motion to suppress, and the current motion as the fourth motion to suppress.  As the record reflects, however, the first motion, which was filed on December 11, 2015 (Dkt. No. 117), was filed in a partially redacted form, and the Court struck that motion without prejudice and allowed Lonich to refile that motion without redactions. See Dkt. No. 146. Lonich then refiled that motion on March 4, 2016, and that motion raised a facial challenge to the search warrant. Dkt. No. 186. Lonich then filed a second motion to suppress on June 10, 2016. Dkt. No. 226.  That motion was addressed in the Court's September 2, 2016 order, which ordered the parties to meet and confer regarding specific documents. Dkt. No. 245. The current briefing, which the government calls Lonich's fourth motion and Lonich calls a continuation of his second, follows that meet and confer.

United States District Court
Northern District of California

9

impermissibly asserted that there was probable cause to believe that "any and all documents reflecting any mention or communication with any of the entities or persons [listed in Section A of Attachment B of the warrant] constituted *per se* evidence of the alleged 101 Houseco fraud." *Id*. at 5.

In response, the government argued that the warrant did not authorize the seizure of "all" documents in the manner suggested by defendant. The government contended,

> As an initial matter, Lonich largely ignores the plain language of the warrant. First, the various subcategories he challenges are all subsets of the actual "item to be seized" as defined with particularity in the first sentence of Section A of Attachment B. Specifically, the actual evidence sought to be seized in Section A is "Evidence of violations of [various federal crimes], involving any scheme relating to a purchase by 101 Houseco, LLC of an IndyMac loan defaulted on by Bijan MADJLESSI associated with Park Lane Villas ("PLV"), using funds obtained from Sonoma Valley Bank, any and all efforts to obtain funding, financing, or refinancing for any PLV-related activity, including from Terra Capital Partners and Freddie Mac." Exhibit A (Warrant Attachment B).
>
> The warrant then goes on to list examples of such evidence, stating that it "includes all documents, business records, photographs, audio or video recordings, communications, and any evidence of the ownership, custody, control of, or association with, any of the following:" after which a number of names and entities relevant to the investigation are listed. *Id*. These subcategories of information are all set forth in Section A following the sentence that specifically and particularly defines "evidence" for the purposes of that portion of the warrant.

Dkt. No. 191 at 3:21-4:6.

The government argued that Lonich "misread" the warrant when he claimed that it authorized the seizure of all documents having anything to do with any of the listed names and entities.  The government asserted that "the warrant does not authorize the seizure of all documents associated with, for example, Sonoma Valley Bank. Rather, it only authorizes the seizure of 'evidence of the ownership, custody, control of, and association with' Sonoma Valley Bank as it relates to the overall scheme to defraud." Id. at 4:15-17.

In an order filed April 15, 2016, the Court denied Lonich's motion to suppress.  The Court agreed with the government that "when read holistically, the warrant validly seeks seizure of 'evidence of ownership, custody, control of, and association with' the listed individuals and entities as it relates to the overall scheme to defraud." Dkt. No. 206 at 8:18-20.

Defendant's overbreadth arguments are not without force. In the Court's view, it was inartful to use the word "all" in the sentence "Such evidence, in physical or

electronic form, includes all documents, business records, photographs, audio or video recordings, communications, and any evidence of the ownership, custody, control of, and association with . . . ." Dkt. No. 190-1 (Warrant Affidavit) (emphasis added). However, the Court agrees with the government that "such evidence" relates back to the evidence of the various crimes charged in the indictment and recited in the previous sentence, that "all" modifies "documents," and that "and any evidence of the ownership, ownership, custody, control of, and association with, any of the following" is a an explanatory limitation on "such evidence." When all its parts are read together, the warrant is not overbroad. The warrant commanded the executing officer to seize "[e]vidence of violations [of specific sections of Title 18 of the United States Code referencing a description of the criminal activities], involving any scheme relating to a purchase by 101 Houseco, LLC . . . ." Id. As described in the attachment to the warrant, the listed names of individuals and entities were examples of "[s]uch evidence" and were "identified as having specific relevance to the investigation leading to this warrant." Id.; cf. United States v. Kow, 58 F.3d 423, 430 (9th Cir. 1995) (warrant affidavit did not provide probable cause to justify generalized seizure of all business documents where affidavit acknowledged that defendant business was a legitimate business and "[a]lthough [the government's] affidavit established probable cause to seize some business records, it did not establish that [defendants' business] was 'permeated with fraud,' the type of showing required to justify the wholesale seizure of business records that occurred here."). Unlike the warrant in Kow, the warrant here did not authorize the wholesale seizure of all of defendant's business records, but rather authorized the seizure of all evidence related to the overall scheme to defraud.

Id. at 8-9.

On June 10, 2016, Lonich filed a second motion to suppress evidence.  Lonich contended that when law enforcement agents executed the search warrant they exceeded the search warrant's scope, as defined by the Court's April 15, 2016 order, by seizing vast amounts of paper and electronic documents that do not relate to the alleged 101 Houseco fraud.  In support of that motion, defense counsel filed a declaration stating "I am informed and believe that the evidence contained in Exhibits B and C to ECF No. 227[7] reflect, inter alia, files concerning the development of the Belvedere in Reno, Petaluma Greenbriar apartments, a libel lawsuit brought by Biganeh Madjlessi, lawsuits brought by and against Bijan Madjlessi, Gregg Smith, Jed Cooper, and others unrelated to 101 Houseco, and thousands of other documents that do not constitute evidence of the alleged 101 Houseco fraud." Dkt. No. 238 ¶ 4.  In response, the government argued that Lonich had failed to meet his burden to show that any particular document was outside the scope of the warrant, and the government also contended that a random sampling of documents demonstrated that all of the seized documents were properly seized.  See Dkt. No. 230.

---

[7] Exhibit B is a list of electronic documents and Exhibit C is a list of paper documents.

In an order filed September 2, 2016, the Court held,

> The Court finds that on the current record, defendant has not met his burden to show that all of the documents listed in exhibits B and C to the Balogh declaration are outside the scope of the warrant. However, the Court also finds that that defense counsel proposed a method by which defendant could have provided specific facts and argument regarding the documents at issue. While the Court has approved the government's use of a Trial Team and a Taint Team in this case, it also appears that this structure has presented some challenges with regard to litigating the current motion. Because of this complexity, and also because, as discussed *infra*, the Court disagrees with some of the positions taken by the government in its opposition to the current motion, the Court orders the parties to engage in a meet and confer process as follows: for every seized document that defendant contends is outside the scope of the warrant, defendant may meet his burden by presenting specific facts and arguments to the appropriate government counsel (Trial Team for non-privileged documents, Taint Team for privileged documents). If appropriate, defendant may group documents into categories, such as "documents related to [non-Houseco 101] lawsuit" or "emails related to [non-Houseco] project." The government shall respond to defendant's showing, and if the parties are unable to resolve their disputes, the parties shall notify the Court in a letter that also proposes a process for resolving the remaining dispute (e.g., by noticed motion, joint letter brief etc.).
>
> In order to provide the parties with guidance during the meet and confer process, the Court addresses the parties' arguments with regard to the scope of the warrant and the seven examples selected by the government. "When the defendant challenges the manner in which a search was conducted, we examine the language of the search warrant and ask whether 'a reasonable officer [would] have interpreted the warrant to permit the search at issue.'" *United States v. Johnston*, 789 F.3d 934, 941 (9th Cir. 2015) (quoting *United States v. Gorman*, 104 F.3d 272, 274 (9th Cir. 1996)). Here, as the government previously argued to this Court and as the Court held in its April 15, 2016 order, the language of the warrant authorized the executing officers to seize "[e]vidence [of specific sections of Title 18 of the United States Code referencing a description of the criminal activities], involving any scheme relating to a purchase by 101 Houseco, LLC . . . ." *Id*. The names of individuals and entities listed in Attachment B were examples of "[s]uch evidence."

Dkt. No. 245 at 12-13. The Court then examined the seven documents identified by the government and found that "a reasonable officer would have interpreted the warrant to permit the seizure of exhibits B and H to the government's opposition, but that the remaining examples are outside of the scope of the warrant." *Id*. at 14:28-15:2. The Court analyzed each document in detail in order to provide the parties guidance for their meet and confer efforts. *Id*. at 15-21.

Following the Court's September 2, 2016 order, the parties met and conferred regarding the documents that Lonich contended were outside the scope of the warrant. On November 23, 2016, Lonich filed a supplemental memorandum in support of the June 10, 2016 motion to suppress. The government filed an opposition, the Court held a hearing on December 20, 2016,

and defense counsel filed a supplemental declaration on December 21, 2016.

## DISCUSSION

### I.     Electronic media protocol

Lonich first contends that the government has not complied with Attachment C to the warrant, which required the government to purge from its possession all electronic files that fell outside the scope of the warrant's authorized seizures.  Attachment C provides:

> Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

Dkt. No. 326-1 at USA 3172.

The Court's September 2, 2016 order directed parties to meet and confer regarding whether the documents listed in Exhibit B to Dkt. No. 227 were outside the scope of the warrant.  In his declaration filed November 23, 2016, Mr. Balogh states following the September order, he engaged in multiple conversations with Taint Team member AUSA Quiroz.  Dkt. No. 281 ¶ 2 (Balogh Decl.).  Mr. Balogh states, "During our conversations, we addressed the thousands of pages—highlighted on Exhibits B and C to ECF No. 227—to identify which, if any, the Taint Team contended were properly seized pursuant to the April 7, 2014 search warrant.  Of those thousands of pages, AUSA Quiroz informed me that the Government would contest only seven documents . . . ."  *Id.*  Mr. Balogh's meet and confer sessions with the Trial Team appear to have been less productive, with Trial Team member AUSA Rees refusing to meet and confer regarding electronic documents for which the government contends Lonich does not have Fourth Amendment standing.  *See id.* ¶¶ 3-5.[8]

---

[8]  Mr. Balogh and Mr. Rees met and conferred regarding electronic documents seized from Lonich's computer and computer network.   As a result of those discussions, Mr. Balogh concedes that the following documents are within the scope of the warrant and therefore withdrawn from the pending motion to suppress:  (A) SVBSW-CF-OS-133612-615; (B) SVBSWCF- OS-144608-09; (C)  SVBSW-CF-OS-148212-34; (D)  SVBSW-CF-OS-149089; (E)  SVBSWCF-OS-119782-84; (F)  SVBSW-CF-OS-125793; (G)  SVBSW-CF-OS-118415; (H)  SVBSWCF-OS-PRIV-0010593-594; (I) SVBSW-CF-OS-0102293-296; (J) SVBSW-CF-OS-0102299-2302; (K) SVBSW-CF-OS-0148845-971; (L) SVBSW-CF-OS-149089; and (M) SVBSW-CFOS-PRIV-0010930-933.

The parties were unable to agree on additional documents identified by the government

United States District Court
Northern District of California

At the December 20, 2016 hearing, the Court asked the parties about whether the government had complied with the electronic media protocol. Dkt. No. 334 at 63 (Dec. 20, 2016 transcript). Defense counsel argued that the government has not complied with the protocol because (1) the government chose not to meet and confer regarding the majority of documents listed in Exhibit B, thereby abandoning the claim that those documents were within the scope of the warrant, and (2) the government has not destroyed those documents. Mr. Rees did not directly respond to Mr. Balogh's statements regarding the meet and confer, and instead referred the Court to the declaration of Special Agent John Wilbur, the Forensic Team Leader responsible for forensic imaging/data extraction of electronic media discovered at the three search site locations. *Id*. at 65-66; Dkt. No. 191-2 (Wilbur Decl.). Mr. Rees argued,

> Mr. Balogh concedes that on each of the devices that we have left there is relevant information. And the Court had before it a declaration all the way back in that second motion to suppress, which the Court denied, where the – John Wilbur, the person who is maintaining these, says you can't pick and choose to delete certain information on a hard drive. You just can't do it. Otherwise, it's not a viable forensic image anymore. . . . So what he's basically asking to do is to somehow access a core piece of evidence that he agrees has relevant evidence and to somehow, like, boot it up like a regular computer and delete certain files off of it, which is just impossible in the forensic context.

Dkt. No. 334 at 65:23-66:11.[9] Thus, the government conceded that the hearing that there are at least some documents listed on Exhibit B that are outside the scope of the warrant, but the government asserts that it cannot delete or destroy those documents without impairing the integrity of the forensic images.

The Court concludes that the government has not demonstrated that it has used reasonable efforts to comply with the electronic media protocol. As an initial matter, the Court finds that compliance with this protocol is required as a term of the court-approved search warrant, and does

---

(Bates Nos. SVBSW-CF-OS-103807-933; SVBSW-CF-OS-148845-71; SVB-SW-CF-OS-PRIV-000775-927; SVB-SW-CF-OS-PRIV-005401-533; and SVB-SW-CF-OS-PRIV-008004-32), and those documents are discussed *infra*.

[9] The government also asserted that the Court has already denied this claim for relief. The Court has not denied this claim for relief. The Court did not specifically address this claim in the September 2, 2016 order, in part because the record was unclear whether there were documents listed in Exhibit B to Mr. Balogh's June 10, 2016 declaration that were outside the scope of the warrant.

not depend on whether Lonich can establish Fourth Amendment standing for every document listed in Exhibit B. *See generally United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1171-72 (9th Cir. 2010). In any event, the Court finds that because the government only chose to contest certain documents in Exhibit B as being within the scope of the warrant, the government has now waived any argument that the uncontested documents listed in Exhibit B are within the scope of the warrant. Further, the government has conceded that it seized electronic documents that are outside the scope of the warrant, yet the government asserts that it cannot delete or destroy these documents because they are located on images that contain relevant documents, and deleting individual files destroys the forensic integrity of the images. However, the government does not explain why it cannot create copies of the images it currently possesses and go through a similar sorting and deleting process as described in Mr. Wilbur's declaration at Paragraphs 12-16. *See* Dkt. No. 191-2 ¶¶ 12-16. If it is not technically possible to perform such a process, the government shall file a declaration explaining why this is so.[10]

## II.     Standing

As an initial matter, the Court notes that Lonich's November 23, 2016 supplemental memorandum asserts for the first time that the government should not be permitted to challenge Lonich's standing with respect to the 101 Houseco documents maintained in the searched office spaces at 960 Doubles Drive "because the Government premised its search warrant on the factual allegation that Mr. Lonich and Mr. Madjlessi owned 101 Houseco." Dkt. No. 280 at 13:15-16. Defendant argues that "that allegation alone or in combination with Mr. Lonich's role as general

---

[10] Defendant also argues that the Court should address the government's "wholesale" seizure of paper documents by suppressing all paper documents instead of applying the standard set forth in *United States v. Johnston*, 789 F.3d 934, 941 (9th Cir. 20015) ("When the defendant challenges the manner in which a search was conducted, we examine the language of the search warrant and ask whether 'a reasonable officer [would] have interpreted the warrant to permit the search at issue.'"). Defendant argues that the warrant contains no protocol to ensure judicial monitoring of the "wholesale seizure of 143 boxes of documents" in violation of *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), and that the Court should suppress all of Lonich's paper documents. The Court's April 15, 2016 order addressed *Tamura*, and the Court's September 2, 2016 order held that it was appropriate to apply the *Johnston* standard when evaluating whether the government exceeded the scope of the warrant. The Court will not revisit this issue, will not suppress all paper documents, and will apply *Johnston*.

United States District Court
Northern District of California

United States District Court
Northern District of California

counsel, establishes his standing over materials seized from the entire premises." *Id*. at 13:18-24 (citing *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005), and *United States v. Issacs*, 708 F.2d 1365 (9th Cir. 1983)).

There are several problems with this argument. First, the Court agrees with the government that it is improper for Lonich to raise an entirely new legal argument for the first time in his supplemental memorandum. Second, even if the government had premised its search warrant on the allegation that Lonich owned 101 Houseco[11] (or on Lonich's position as general counsel), "it does not suffice for Fourth Amendment standing merely to own a business, to work in a building, or to manage an office." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 697 (9th Cir. 2009) (discussing *Gonzalez*, 412 F.3d at 1116-17). The Court also finds that it is not "necessarily inconsistent" for the government to allege that Lonich secretly controlled 101 Houseco while also asserting that Lonich does not have standing to challenge the seizure of documents from throughout the offices at 960 Doubles Drive. *See Isaacs*, 708 F.2d at 1368 (holding government may not argue that a defendant was in possession of incriminating evidence but deny that there was any expectation of privacy where the circumstances of the case make the positions "necessarily inconsistent"; defendant had legitimate expectation of privacy in locked safe in closet of his own apartment in which journals were found and thus could contest the lawfulness of their seizure, even though defendant testified at trial that journals were not his).

Lonich also raises a factual challenge to the Court's earlier holding that Lonich did not have standing to challenge the search of 960 Doubles Drive Units 112-114 beyond the search of his own personal office. Lonich asserts that the Court incorrectly believed that there were only three offices that were searched (each of the three units), and that the Court did not understand that there were numerous offices within the three units and that Lonich maintained his legal files not only in his personal office, but in other spaces within Unit 112, such as the storage spaces, hallway, and in his paralegal's office. The parties agree that the Court's earlier orders regarding

---

[11] The search warrant was premised on, *inter alia*, the allegation that Lonich and Madjlessi secretly controlled 101 Houseco. *See* Dkt. No. 326-1 ¶ 35 (Neeley Aff.).

16

standing were based on a misunderstanding of the layout of the office space that was searched, although each side blames the other for not providing a full or accurate record on this point.  In any event, the Court finds that its previous determination regarding Lonich's standing to challenge the search of 960 Doubles Drive was based on a factual error, and therefore that it is appropriate to revisit this question on an accurate record.

Defendant has the burden to establish his standing to challenge a search or seizure on Fourth Amendment grounds.  *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007), *cert. denied*, 552 U.S. 1105 (2008).  In *SDI Future Health, Inc*., the Ninth Circuit held, "except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized." 568 F.3d at 698.  The Court concludes that based upon Lonich's November 23, 2016 declaration, Lonich has established his standing to challenge the seizure of documents from his own personal office ("1J"), as well as the seizure of his client files from the storage offices, the office used by his paralegal,[12] and in the seven file cabinets located in the hallway (areas "1G," "1i," "1E," and "1M").[13]  The Court finds that Lonich has shown a "personal connection" to those places and the materials seized because Lonich is an attorney and all of the seized material consisted of Lonich's client files.

However, the Court finds that Lonich has not established standing to challenge the seizure of documents from any of the other searched spaces at 960 Doubles Drive.  As the government notes, Lonich states in his declaration that he was retained as general counsel for Bijan Madjlessi, as well as entities that he controlled and all entities that Biganeh Madjlessi controlled, and that the Madjlessis "and the employees of the entities they controlled" maintained their offices at 960

---

[12]  Lonich states that the materials maintained in his paralegal's office were files for then pending lawsuits and entities for which he was responsible for maintaining and preserving the books and records. Dkt. No. 282 ¶ 12.

[13]  It is not clear from the record before the Court if documents other than Lonich's client files were seized from the storage offices, his paralegal's office, or the file cabinets in the hallway. Lonich has made no showing that he would have standing to challenge the seizure of any documents other than his client files from these areas.

United States District Court
Northern District of California

Doubles Drive. *Id*. at ¶¶ 2-4. Thus, according to Lonich, the other offices were the Madjlessis' or those of Bijan Madjlessi's employees. Lonich's role as general counsel for Madjlessi does not establish, on its own, that he exercised daily management and control over, for example, Stephanie Burman's office (Lonich states that Stephanie Burman provided accounting and bookkeeping services for Bijan Madjlessi and/or his controlled companies, *Id*. ¶ 5).

### III.  Taint team documents

The Court now turns to the contested documents. There are seven taint team documents at issue. The Court finds that Lonich does not have standing as to the five documents seized from Stephanie Burman's office. As to the other two documents (Documents 281 (SVBSW-CF-OS-0120847) and 289 (SVBSW-CF-OS-0126513)), the Court finds that Document 281 does not fall within the scope of the warrant but that Document 289 does. On its face, Document 281 does not contain any reference to 101 Houseco, discusses an unidentified loan that does not have any apparent connection to 101 Houseco, and it is dated December 21, 2012, which is outside the alleged conspiracy time period. Document 289, on the other hand, explicitly mentions "Houseco" and is dated within the alleged conspiracy period. Even if Document 289 is not evidence of the alleged 101 Houseco fraud, a reasonable executing agent would have interpreted the warrant to permit the seizure of this document.

### IV.  Trial team documents[14]

#### 1.  Box_135-000001

This document is an email from John Barr to Madjlessi and Lonich dated July 27, 2010, and the email "recap[s] our discussions yesterday" regarding, *inter alia*, "132 Village" and rents

---

[14] Defendant's supplemental memorandum lists the following documents as being in dispute: Box_135-002472-73, Box_135-002490-92, Box_142-000283-512, Box_142-001174-75, Box_142-001197-1206, and Box_142-001955-75. However, the government's opposition states the disputes regarding these documents were resolved during the meet and confer process. Dkt. No. 326 at 4 n.3. Defendant did not contradict the government's statement either at the hearing or in Mr. Balogh's December 21, 2016 declaration, and thus the Court will not consider those documents.

18

and repairs.  The warrant affidavit describes 132 Village Square, LLC as the entity that obtained several loans to fund the PLV project, including the IndyMac loan to construct the East Side of the Park Lane Villas, and it is this loan that Madjlessi defaulted on and that 101 Houseco purchased in the auction.  *See* Dkt. No. 326-1 ¶¶ 9-13.  The search warrant authorized the seizure of evidence of "ownership, custody, control of, and association with" 132 Village Square.  The Court finds that because the search warrant affidavit contains information directly tying 132 Village Square to the alleged 101 Houseco fraud, a reasonable executing agent would have interpreted the warrant to permit the seizure of this document as evidence of Lonich and Madjlessi's "ownership, custody, control of, and association with" 132 Village Square.

### 2.    Box_135-00004-13

These documents include an email dated March 11, 2009 that has a number of title-related documents attached to it. The property at issue is a condominium in the "Village Square at Courtside Village" project, and a title report shows that "132 Village Square Group, LLC" has multiple deeds of trust on the property.  The government argues that these documents are within the scope of the warrant because, *inter alia*, they include an Exhibit A that is signed by Bijan Madjlessi on behalf of "132 Village Square, LLC" and in his role of "President" of "Park Lane Villas, Inc."  132 Village Square obtained several of the loans to fund the PLV project, and thus the Court finds that evidence regarding Madjlessi's connection to 132 Village Square LLC, even if that evidence predates the alleged conspiracy and involves a different real estate project, is relevant to this case.

### 3.    Box_135-00020-51

This document is a transfer agreement between "132 Village Square, LLC," "Bijan Madjlessi," and "Sonoma Valley Bank."  The document makes specific reference to the April 11, 2007 loan Sonoma Valley Bank made to 132 Village Square, which is one of the loans that is discussed in the warrant affidavit that provided funds to build the Park Lane Villas.  The Court finds that a reasonable executing agent would have interpreted the warrant to permit the seizure of

19

this document.

### 4.   Box_135-000053-54 and Box_135-000055-56

The title of each of these documents is "Owner's Affidavit," both are dated July 2010, and both documents relate to "132 Village Square, LLC."   For the reasons stated above, the Court finds that it was reasonable for an officer to seize what appears to be evidence of the ownership of 132 Village Square, LLC.

### 5.   Box_135-000166-183

These are pleadings filed by Lonich in 2013 in his capacity as attorney for Madjlessi relating to litigation between Madjlessi and WestAmerica Bank in Sonoma County Superior Court.   WestAmerica Bank is alleged in the search warrant affidavit to be the successor institution to Sonoma Valley Bank.   In one document, Lonich states that he "caused" an attached declaration of Steven Bauer to be lodged with the court.   Mr. Bauer's declaration states that he has become aware of a "federal grand jury investigation [that] relates to the failure of Sonoma Valley Bank in 2010." Box_135-000166.   The Court finds that these documents were within the scope of the search warrant because the search warrant authorized the seizure of evidence relating to "Section 1512(c) (Attempted Obstruction of Justice – Tampering with a Witness)."   The affidavit alleges, *inter alia*, that Lonich and Madjlessi attempted to obstruct justice, and the indictment specifically alleged that Lonich attempted to obstruct the federal grand jury mentioned in this document.

### 6.   Box_135-000792-1611

These documents are more pleadings from the case discussed *supra* between Madjlessi and WestAmerica Bank, as well as other documents related to that litigation such as discovery responses, emails and notes.   The documents include a declaration of Lonich where he states that he has "since 2009 been the attorney for a limited liability company named 101 Houseco, LLC ('Houseco'), which in 2009 entered into a loan transaction with Sonoma Valley Bank." Box_135-001501.   These documents also contain references to the criminal investigation by a federal grand

United States District Court
Northern District of California

jury, as well as Sonoma Valley Bank's loan to 132 Village Square.  The Court finds that a reasonable officer could conclude that these documents were evidence of the alleged 101 Houseco fraud as well as attempted obstruction of justice.

### 7.   Box_135-001630-1652, Box_135-001653-1716

These are documents evidencing a loan between Sonoma Valley Bank and Farhad Hariri (Madjlessi's brother in law) and his defaulting on that loan, as well as documents related to a foreclosure lawsuit filed by WestAmerica Bank against Farhad Hariri.  Neither the lawsuit nor the loan involves 101 Houseco or the PLV project.  The government argues that this evidence is within the scope of the warrant because the search warrant affidavit alleges that "Madjlessi's brother in law" was involved with a precursor company to 101 Houseco called 103 Star LLC.  The Court notes, however, that Hariri is not identified as Madjlessi's brother in law in the affidavit, and his name simply appears on the list of individuals in Attachment B who are "witnesses, potential victims, or [] potentially involved in the scheme described herein."  The government also notes that one document in the box states that Brian Melland was the loan officer for Farhad Hariri's loan at Sonoma Valley Bank.  *See* Box_135-001639.  The government argues that a "reasonable officer was entitled to seize this evidence that connects one of the defendants and the victim bank to an individual directly connected to the 101 Houseco fraud as detailed in the search warrant."  Dkt. No. 326 at 7:13-16.

The Court finds that the connection the government seeks to draw is too attenuated, particularly given the fact that the search warrant affidavit does not explain who Hariri is or his connection to the alleged 101 Houseco fraud.  Further, the documents on their face do not have any relationship to the alleged 101 Houseco fraud.  Under these circumstances, the Court finds that this document is outside the scope of the warrant.

### 8.   Box_135-001717-32

This is a Sonoma Valley Bank document titled "Enterprise Review" that examines the loan relationship between the Madjlessis and Sonoma Valley Bank.  The document details the loan to

21

132 Village Square, LLC for the PLV project, and makes numerous references to the PLV project. The Court agrees with the government that a reasonable officer would believe these documents to be related to the alleged 101 Houseco fraud.

### 9. Box_135-002189

This document is titled "Capital raised by Ananda Advisors vs. PPM Criteria," and contains a chart showing amounts raised.  The government argues that this document shows the identity of the owners of an entity that was specifically alleged to be a straw owner of 101 Houseco.  The government notes that search warrant affidavit alleges that in March 2011, J.H. "was removed as the [straw] owner of 101 Houseco and replaced by a company known as Ananda Partners 1, LLC."  Dkt. No. 326-1 ¶ 42 (search warrant affidavit).

If this document showed the identity of the owners of Ananda Partners 1, LLC, the Court would agree with the government.  However, there is nothing on the face of this document showing the identity of the owners, nor is there anything suggesting a connection to the overall alleged scheme to defraud.  Accordingly, the Court finds a reasonable officer would not have believed this document to be within the scope of the warrant.

### 10. Box_135-002191-2193

This document is a chart listing monthly disbursements to partners of Ananda Partners I, II and III, and lists the identities of the partners.  Because the affidavit alleges that Ananda Partners I replaced J.H. as the straw owner of 101 Houseco, the Court finds that this document is within the scope of the warrant.

### 11. Box_135-002194-2195

This document is titled "G & J Exposure."  The government asserts that this document presumably relates to "G"reg Smith and "J"ed Cooper, who are both named in the search warrant. The government notes that one of the listed exposures is "Conflict between Gregg as CPA and his clients, Ananda, its investors, and SABT/Houseco" while another is "CPA directed adjustments to

United States District Court
Northern District of California

be made on books of SABT and Houseco without consent of manager." The second page also includes two explicit references to 101 Houseco and what appear to be payments to 101 Houseco.

The Court agrees with the government that a document that specifically references 101 Houseco was reasonably seized pursuant to the search warrant.

### 12.    Box_135-002231-2279

These documents are pleadings from lawsuits brought by WestAmerica Bank, the successor to Sonoma Valley Bank, against Cooper, Smith and Hariri regarding the Petaluma Greenbriar loans.  Lonich represented Cooper and Smith in those lawsuits.   The documents also include an email from Lonich to Cooper and Smith.  The government argues these documents are within the scope of the warrant because Cooper, Smith and Hariri are mentioned in the search warrant affidavit as being related to the fraud.  The government also argues that the documents demonstrate that Lonich had access to private information of Cooper and Smith in that he sends emails purporting to contain their "financial information" and a "declaration regarding net worth." Box_132-002232-33.

The Court is not persuaded by the government's arguments.  The government does not argue that the Petaluma Greenbriar loans or lawsuits are evidence of the alleged 101 Houseco fraud.  Further, as the Court noted in its September 2, 2016 order, the search warrant affidavit does not explain who Cooper and Smith are or their connection to the alleged 101 Houseco fraud.  *See* Dkt. No. 245 at 15-16.  Similarly, as noted above, the search warrant affidavit does not explain who Hariri is.  Without any information in the affidavit tying these individuals to the alleged fraud, the Court cannot find that a reasonable executing agent would believe that the warrant authorized the seizure of these documents under the construction of the warrant advocated by the government and adopted by this Court.

### 13.    Box_135-2281-2282

This document lists "All Ananda Partners" for Ananda Partners I, Ananda Partners II, and Ananda Partners III as of October 9, 2012.  As stated above, because the search warrant alleges

23

that Ananda Partners I replaced J.H. as the straw owner of 101 Houseco, the Court finds that this document showing the identities of the Ananda Partners I is within the scope of the warrant.

### 14.    Box_135-002296-2297

This document includes a Certificate of Board of Directors for Greenbriar Construction Company which is signed by Madjlessi and that authorizes Lonich to "execute any and all documents that he deems reasonably necessary for the Company [Greenbriar Construction] to purchase" a certain piece of property.  The Court finds that a reasonable officer was entitled to seize this document because it is direct evidence of the "ownership, custody, [and] control of… Greenbriar Construction," and the search warrant alleges that Madjlessi served as the primary construction contractor for PLV through, *inter alia*, Greenbriar Construction.  Dkt. No. 326-1 ¶ 9.

### 15.    Box_135-2393-2459

These documents include a Transfer Agreement, emails, and documents related to a lawsuit between Menlo Oaks Corporation and Sonoma Valley Bank.  The government notes that an addendum to the Transfer Agreement sets forth an agreement between 101 Houseco, LLC and an individual. The documents also contain a number of instances of Madjlessi signing documents as "President" of Menlo Oaks Corporation.  The Court finds that a reasonable officer was justified in seizing this document given that it mentions 101 Houseco.  Further, this document is within the scope of the warrant because it is evidence of the ownership, custody, and control of Menlo Oaks, and the search warrant alleges that Madjlessi served as the primary construction contractor for PLV through, *inter alia*, Menlo Oaks.  Dkt. No. 326-1 ¶ 9.

### 16.    Box_135-002465-2466 and Box 135_002474-2489

These are pleadings in a lawsuit filed by WestAmerica Bank against Madjlessi, and there are references in the documents to a "criminal investigation" that the government asserts is the criminal investigation in this case. The Court agrees with the government that a reasonable officer would believe that these documents are within the scope of the warrant.

United States District Court
Northern District of California

### 17.    Box_142-000529, Box_142-000591, Box_142-001087-88, and Box_142-001089-92

The first document is an email to Lonich wherein he receives financial information that he had "requested" for three Ananda entities, including "Ananda Advisors, LLC." The second document is a check from Lonich's account to Annadel Capital, with a reference to "Ananda I." The third document is an invoice from Ananda Partners II, LLC to Lonich, as well as a statement regarding Ananda Partners II.  The fourth batch contains one invoice from Ananda Partners, III, and three documents related to Ananda I, two of which specifically reference Houseco.  *See* Box_142-001090, Box_142-001092.

The Court finds that first document is within the scope of the warrant because the warrant states that Ananda Advisors is connected to 101 Houseco, LLC, and that document shows Lonich requesting information in order to make a deposit into Ananda Advisors.  The Court also finds that the second and fourth batches fall within the scope of the warrant, both because several of them explicitly mention "Houseco" and because the warrant affidavit states that once J.H. was removed as the straw owner of 101 Houseco, Ananda Partners 1, LLC became the straw owner.  However, the search warrant does not tie Ananda II or Ananda III to the alleged 101 Houseco fraud (indeed, these entities are not mentioned in the affidavit), and thus the Court finds the third group of documents are outside the scope of the warrant.

### 18.    Box_142-000534 and Box_142-000537

These are two checks, the first from the law office of David Lonich to the law office of Paul Wolf "for Patricia Brajkovich."  The government notes that the search warrant affidavit alleges that one of the false asset verification letters created by Lonich and Cutting as part of their fraudulent efforts to gain control of PLV was submitted on Brajkovich's behalf.  *See* Dkt. No. 326 ¶¶ 43-51.  The government argues, and the Court agrees, that evidence that Lonich made a payment to a lawyer for or on behalf of Brajkovich is evidence he may have involved her in the 101 Houseco fraud.

The second document is a check from Lonich's attorney/client trust account to himself. The Court agrees with the government that it was reasonable to seize evidence of payments Lonich made to himself given that a goal of fraud is to obtain money and property.

### 19.    Box_142-000587-589

This document, dated April 29, 2011, is a request by Lonich for a wire transfer to William Vandever in the amount of $252,500.  The government states that while it "understands the Court's prior order that not all evidence of association between the various individuals listed in the warrant is seizable, evidence of such a large monetary payment from one of the named defendants to another party specifically named in Attachment B was reasonably seized."  Dkt. No. 326 at 11.

The problem with this argument is that the search warrant affidavit does not contain any information about Vandever or his connection to the alleged fraud.  The only reference to Vandever is his inclusion in the list of names of individuals in Attachment B who are "witnesses, potential victims, or [] potentially involved in the scheme described herein."  Without either more information in the affidavit regarding Vandever or some indication on the face of the document that there is a connection to the alleged fraud, the Court finds this document outside the scope of the warrant.

### 20.    Box_142-00982-986, Box_142-000989-92, and Box_142-001173

These documents are various emails between individuals discussing the FBI's investigation into Madjlessi and a Reno real estate project.  However, as the government notes, in those emails the individuals also discuss matters directly relevant to this case, including the fact that Madjlessi reacquired the defaulted IndyMac note in the DebtX auction and that Madjlessi used straw buyers for the "Santa Rosa Condo Sales."  The Court finds that all of these documents were properly seized.

### 21.    Box_142-001080-82

This is Lonich's resume, in which he describes his work with Madjlessi on the Park Lane

United States District Court
Northern District of California

Villas project.  The Court finds that his document was properly seized.

### 22.   Box_142-001190

This is an accounting chart that shows income, expenses, and gross rent for an unnamed real estate project between July 2012 and June 2013.  Defendant asserts this document is related to "SABT," but he has cited no evidence to support that claim.  The government asserts that this document "just as likely documents the rental income of the Park Lane Villas, and so a reasonable officer was entitled to seize it."  Dkt. No. 326 at 12:9-10.  The government notes that Attachment B to the search warrant authorized the seizure of "[e]vidence of the custody, occupancy, ownership, or control of PLV and any money generated by or associated with it by any party".

The Court agrees with the government that it was reasonable to seize this document as possible evidence of "money generated by" PLV.  The Court also notes that the time period covered by the document overlaps with the timeframe of the alleged conspiracy.

### 23.   Box_142-001213-17

This is a check register showing money paid to and from a bank account controlled by Lonich for the period March to December 2011.  The register shows a number of deposits from 101 Park Lane, and also shows that Lonich paid 101 Houseco $10,010 and paid another individual $2,500 with a description listed of 101 Houseco.  The Court finds that this document was properly seized.

### 24.   Box_142-001220

This is a spreadsheet identifying the signatories for bank accounts of entities specified in the warrant, namely Greenbriar Construction ("Bijan or Stephanie"), Menlo Oaks ("Bijan only"), and Masma Construction ("Bijan or Stephanie").  These entities are described in the affidavit as being controlled by Madjlessi, and also specifically involved in the PLV project.  Dkt. No. 326-1 ¶ 9.  The Court finds that this document was properly seized as evidence of the "ownership, custody, [and] control of" "Masma Construction, Greenbriar Construction, and Menlo Oaks

1  Corporation."

2

3  **25.  Box_142-001228-58 and Box_142-001259-1588**

4      The first document is a complaint filed by the FDIC as receiver against Cutting, Melland,

5  and another individual alleging gross negligence against them in their handling of, *inter alia*, their

6  loans to "132 Village Square," for the PLV project.  The second set of documents includes a

7  forbearance agreement between 132 Village Square and Madjlessi, and numerous documents

8  relating to the 132 Village Square loans from Sonoma Valley Bank, including board approvals of

9  the loans, financial documents for 132 Village Square, lists of condo purchasers within the Park

10  Lane Villas, and a document signed by Madjlessi in his capacity as the "President" of "Parklane

11  Villas, Inc." that is also signed by Melland on behalf of Sonoma Valley Bank. Box_142-001268.

12      The Court finds that a reasonable officer would believe these documents fell within the

13  scope of the warrant as they relate to loans for the PLV project and the PLV project generally.

14

15  **26.  Box_143-000386-87**

16      This is a two-page accounting of payments made from Masma Construction to 132 Village

17  Square that includes a reference to an August 25, 2009 payment to "PRESS DEMOCRAT-PLV."

18  The Court finds this document was properly seized because the search warrant specifically

19  authorized the seizure of "any records relating to any funds generated by or associated with PLV

20  and the disposition of any such funds," and the affidavit states that 132 Village Square, LLC and

21  Masma Construction were controlled by Madjlessi and involved in the PLV project.

22

23  **27.  SVBSW-CF-OS-0103807-933, SVBSW-CF-OS-PRIV-0000775-927, and
       SVBSW-CF-OS-PRIV-0005401-553**

24

25      These are all copies of a transcript of an October 25, 2011 deposition that Lonich gave in a

26  bankruptcy case involving several Petaluma Greenbriar entities.  In it, Lonich is questioned about

27  the federal investigation of Madjlessi that led to this case, and he stated he did not know if there

28  was such an investigation.  The Court finds that an officer could reasonably believe that this

United States District Court
Northern District of California

document was covered by the search warrant.

### 28. SVBSW-CF-OS-0118415-554 and SVBSW-CF-OS-PRIV-0008004-32

The first set of documents are publically filed court pleadings (complaints and exhibits, declaration of Sean Cutting, court orders) in a lawsuit between Sonoma Valley Bank and 132 Village Square, regarding some of the loans identified in the search warrant. The second set of documents includes a forbearance agreement about those same loans, as well as emails between Lonich and Madjlessi regarding the agreement. The Court finds that these documents are within the scope of the warrant as these materials relate to some of the loans identified in the search warrant that were directly associated with PLV.

### CONCLUSION

Accordingly, the Court holds that (1) the government must comply with the electronic media protocol by destroying or deleting all electronic documents outside the scope of the warrant (including electronic documents that the government did not contest in the meet and confer) as set forth in this order, and if that is not technically possible, file a declaration explaining why, (2) the paper documents that the Court has ruled are outside the scope of the warrant are suppressed, and (3) any paper documents that the government did not contest in the meet and confer process are deemed outside the scope of the warrant and are therefore suppressed.

**IT IS SO ORDERED**.

Dated: January 23, 2017

_____
SUSAN ILLSTON
United States District Judge